# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE APPRAISAL OF SOLERA HOLDINGS, INC. | ) ) ) ) | CONSOLIDATED C.A. No. 12080-CB |

## MEMORANDUM OPINION

Date Submitted: April 6, 2018
Date Decided: July 30, 2018

Stuart M. Grant, Christine M. Mackintosh, and Vivek Upadhya of GRANT & EISENHOFER P.A., Wilmington, Delaware; Daniel L. Berger of GRANT & EISENHOFER P.A., New York, New York; Lawrence M. Rolnick, Steven M. Hecht, and Jonathan M. Kass of LOWENSTEIN & SANDLER LLP, New York, New York; *Attorneys for Petitioners*.

David E. Ross and S. Michael Sirkin of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Yosef J. Riemer, Devora W. Allon, Elliot C. Harvey Schatmeier, Richard Nicholson, and Madelyn A. Morris of KIRKLAND & ELLIS LLP, New York, New York; *Attorneys for Respondent*.

**BOUCHARD, C.**

In this appraisal action, the court must determine the fair value of petitioners' shares of Solera Holdings, Inc. as of March 3, 2016, when Vista Equity Partners acquired Solera for $55.85 per share, or approximately $3.85 billion in total equity value, in a merger transaction. Unsurprisingly, the parties have widely divergent views on this question.

Relying solely on a discounted cash flow analysis, petitioners contend that the fair value of their shares is $84.65 per share—approximately 51.6% over the deal price. Until recently, respondent consistently argued that the "best evidence" of the fair value of Solera shares is the deal price less estimated synergies, equating to $53.95 per share. After an appraisal decision in another case recently used the "unaffected market price" of a company's stock to determine fair value, however, respondent changed its position to argue for the same measure of value here, which respondent contends is $36.39 per share—about 35% below the deal price.

Over the past year, our Supreme Court twice has heavily endorsed the application of market efficiency principles in appraisal actions. With that guidance in mind, and after carefully considering all relevant factors, my independent determination is that the fair value of petitioners' shares is the deal price less estimated synergies—*i.e.*, $53.95 per share.

As discussed below, the record reflects that Solera was sold in an open process that, although not perfect, was characterized by many objective indicia of reliability.

The merger was the product of a two-month outreach to large private equity firms followed by a six-week auction conducted by an independent and fully authorized special committee of the board, which contacted eleven financial and seven strategic firms. Public disclosures made clear to the market that the company was for sale. The special committee had competent legal and financial advisors and the power to say no to an underpriced bid, which it did twice, without the safety net of another bid. The merger price of $55.85 proved to be a market-clearing price through a 28-day go-shop that the special committee secured as a condition of the deal with Vista, one which afforded favorable terms to allow a key strategic competitor of Solera to continue to bid for the company.

The record further suggests that the sales process was conducted against the backdrop of an efficient and well-functioning market for Solera's stock. Before the merger, for example, Solera had a deep base of public stockholders, its shares were actively traded on the New York Stock Exchange and were covered by numerous analysts, and its debt was closely monitored by ratings agencies.

In short, the sales process delivered for Solera stockholders the value obtainable in a *bona fide* arm's-length transaction and provides the most reliable evidence of fair value. Accordingly, I give the deal price, after adjusting for synergies in accordance with longstanding precedent, sole and dispositive weight in determining the fair value of petitioners' shares as of the date of the merger.

2

## I.    BACKGROUND

The facts recited in this opinion are my findings based on the testimony and documentary evidence submitted during a five-day trial.  The record includes over 400 stipulations of fact in the Stipulated Joint Pre-Trial Order ("PTO"),[1] over 1,000 trial exhibits, including fourteen deposition transcripts, and the live testimony of four fact witnesses and three expert witnesses.  I accord the evidence the weight and credibility I find it deserves.

### A.    The Parties

Respondent Solera Holdings, Inc. ("Solera" or the "Company") is a Delaware corporation with headquarters in Westlake, Texas.[2]  Solera was founded in 2005 and was publicly traded on the New York Stock Exchange from May 2007 until March 3, 2016, when it was acquired by an affiliate of Vista Equity Partners ("Vista") in a merger transaction (the "Merger").[3]

From Solera's inception through the Merger, Tony Aquila served as Chairman of the Board of Directors (the "Board"), Chief Executive Officer, and President of Solera.[4]  Over this time period, Aquila made all top-level decisions about product

---

[1] The court appreciates the parties' efforts in reaching agreement on a thorough set of factual stipulations.

[2] PTO ¶ 75.

[3] *Id.* ¶¶ 1, 77 & Ex. A.

[4] *Id.* ¶ 81.

innovation, corporate marketing, and investor relation efforts.[5]  After the Merger, Aquila remained the CEO of Solera.[6]

Petitioners consist of seven funds that were stockholders of Solera at the time of the Merger:  Muirfield Value Partners LP, Fir Tree Value Master Fund, L.P., Fir Tree Capital Opportunity Master Fund, L.P., BlueMountain Credit Alternatives Master Fund L.P., BlueMountain Summit Trading L.P., BlueMountain Foinaven Master Fund L.P., and BlueMountain Logan Opportunities Master Fund L.P. Petitioners collectively hold 3,987,021 shares of Solera common stock that are eligible for appraisal.[7]

## B.    Solera's Business

In early 2005, Aquila founded Solera with aspirations to bring about a digital evolution of the insurance industry, starting with the processing of automotive insurance claims.[8]  Aquila viewed Solera as a potential disruptor, akin to Amazon.com, Inc., in its specific industry.[9]

---

[5] *Id*. ¶ 82.

[6] *Id*. ¶ 83.

[7] *Id.* ¶¶ 12, 22-24, 30-32, 39.

[8] *Id.* ¶¶ 76, 80.

[9] Tr. 369-70, 375 (Aquila).

4

Solera, in its current form, is a global leader in data and software for automotive, home ownership, and digital identity management.[10] At the time of the Merger, Solera's business consisted of three main platforms: (i) Risk Management Solutions; (ii) Service, Maintenance, and Repair; and (iii) Customer Retention Management.[11] The Risk Management Solutions platform helps insurers digitize and streamline the claims process with respect to automotive and property content claims.[12] The Service, Maintenance, and Repair platform digitally assists car technicians and auto service centers to diagnose and repair vehicles efficiently, accurately, and profitably, and to identify and source original equipment manufacturer and aftermarket automotive parts.[13] The Customer Retention Management platform provides consumer-centric and data-driven digital marketing solutions for businesses that serve the auto ownership lifecycle, including property and casualty insurers, vehicle manufacturers, car dealerships, and financing providers.[14] Solera was operating in 78 countries at the time of the Merger.[15]

---

[10] PTO ¶ 117.

[11] *Id.* ¶ 118.

[12] *Id.* ¶ 120.

[13] *Id.* ¶ 125.

[14] *Id.* ¶ 128.

[15] Tr. 659-60 (Giger).

## C. Solera Expands Aggressively Through Acquisitions

Solera's business was not always so diverse. During the Company's early years, the vast majority of Solera's revenues was derived from claims processing.[16] But the claims business was facing pressure[17] as a result of maturation,[18] advances in automotive technology like collision avoidance and self-driving cars,[19] and competition.[20]

In August 2012, Aquila implemented a plan called "Mission 2020" to increase Solera's revenue and EBITDA through acquisitions and diversification.[21] Solera aspired to become a "cognitive data and software and services company" that would address the entire lifecycle of a car.[22]

The Mission 2020 goals included growing revenue from $790 million in fiscal year 2012 to $2 billion by fiscal year 2020, and increasing adjusted EBITDA from $345 million to $800 million over that same period.[23] To meet these benchmarks,

---

[16] PTO ¶¶ 134-138.

[17] *Id.* ¶ 163.

[18] Tr. 23-24 (Cornell); JX0121.0007.

[19] Tr. 32 (Cornell); JX0092.0012-13.

[20] Tr. 207-08 (Cornell); 758-60 (Yarbrough); JX0092.0014-15.

[21] PTO ¶¶ 159-61, 163.

[22] Tr. 372-73, 381 (Aquila).

[23] PTO ¶ 160.

Solera implemented its "Leverage. Diversify. Disrupt." ("LDD") business strategy.[24]

LDD was a three-pronged strategy. First, Solera sought to "leverage" its claims processing revenue in a given geographic area to gain a foothold in that area. Second, Solera sought to "diversify" its service offerings in the given geographic area. Third, Solera's longer-term objective was to "disrupt" the market by integrating its service offerings such that vehicle owners and homeowners could use Solera's software to manage their purchases, maintenance, and insurance claims all in one place.[25]

## D.    The Market's Reaction to LDD

Between the formulation of Mission 2020 and the Merger, Solera invested approximately $2.1 billion in acquisitions.[26] These acquisitions often were "scarcity value transactions" that involved Solera paying a premium for unique assets.[27] The multiples Solera paid in these acquisitions not only were relatively high but were increasing over time, generating lower returns on invested capital.[28] As a result,

---

[24] *Id.* ¶ 132.

[25] *Id.* ¶ 133.

[26] *Id.* ¶ 165.

[27] Tr. 386-88 (Aquila).

[28] *Id.* at 387 (Aquila), 1063 (Hubbard); JX0899.0050-51.

7

Solera's leverage increased while its EPS essentially remained flat and its EBITDA margins shrank.[29]

Some analysts were skeptical of Solera's evolution-through-acquisitions strategy, taking a "show me" approach to the Company.[30] These analysts struggled to understand Solera's diversification plan[31] and complained that management's lack of transparency about the Company's strategy impeded their ability to value Solera appropriately.[32] Aquila, the Board, and other analysts believed that the market misunderstood Solera's value proposition and that its stock traded at a substantial discount to fair value.[33]

Compounding the challenges Solera was facing in the equity markets, Solera was encountering difficulties in the debt markets. Solera needed to have access to debt financing to execute its acquisition strategy, but by the time of the Merger, Solera was unable to find lenders willing to finance its deals due to its highly-levered balance sheet. For example, upon the announcement that Solera planned to issue tack-on notes in November 2014, "the proceeds of which, along with balance sheet

---

[29] JX1101.0056, 151-52, 175-76.

[30] JX1101.0030.

[31] PTO ¶ 241; Tr. 478-79 (Aquila).

[32] PTO ¶¶ 244-46.

[33] Tr. 464-67 (Aquila), 861 (Yarbrough); JX0175.0108 (William Blair & Company); JX0301.0001 (Goldman Sachs); JX0325.0001 (Goldman Sachs).

cash, [were] expected to effect a strategic acquisition," Moody's Investors Service downgraded Solera's credit rating from Ba2 to Ba3.[34] Moody's noted that "the company has been actively pursuing acquisitions, often at very high purchase multiples," and warned that "[r]atings could be downgraded [further] if the company undertakes acquisitions that, after integration, fail to realize targeted margins."[35]

In late May 2015, management began discussing an $850 million notes offering with Goldman Sachs, the proceeds of which the Company planned to use to fund acquisitions and refinance outstanding debt.[36] The offering fell approximately $11.5 million short, and Goldman was forced to absorb the notes that it could not sell into the market.[37] In July 2015, Moody's downgraded Solera again,[38] commenting "[t]he ongoing, cumulative impacts of debt assumed for acquisitions and for the buyout of its joint venture partner's 50% share . . . plus ramped up share buybacks and dividends, have pushed Moody's expectations for [Solera's] intermediate-term leverage to approximately 7.0 times, a level high even for a B1-

---

[34] JX0140.0003. "Ba" obligations are those "judged to be speculative and are subject to substantial credit risk." *Rating Symbols and Definitions*, MOODY'S INV'R SERV. 6 (June 2018), https://www.moodys.com/researchdocumentcontentpage.aspx?docid=PBC_79004.

[35] JX0140.0003.

[36] Tr. 409-11 (Aquila); JX0258.004.

[37] Tr. 412-14 (Aquila); JX0318.001.

[38] Tr. 416-17 (Aquila); JX0310.0004.

rated credit."[39]  As Aquila testified, Solera was "out of runway" shortly before the Merger to execute the rest of its acquisition strategy because creditors were unwilling to loan funds to Solera at tolerable interest rates.[40]

### E.    Aquila Expresses Displeasure with his Compensation at Solera

Solera's stock price affected Aquila personally.  His compensation was tied to "total shareholder return," and the majority of his stock options were underwater.[41] Aquila did not receive a performance bonus in 2011, 2012, or 2013.[42]  In February 2015, he emailed Thomas Dattilo, Chair of the Compensation Committee, saying "I've poured a great deal of time, inventions and sacrifice during this time in the company's transition and I really need to get something meaningful for it."[43]  At one point, Aquila threatened to leave Solera if his compensation was not reconfigured.[44]

The Board recognized Aquila's value to the Company and took his request and threat to leave seriously.  Dattilo commented "the way [S]olera is structured, we would probably need three people to replace him, and even that would not really

---

[39] JX0310.0004.  "B" obligations are those "considered speculative and are subject to high credit risk."  *Rating Symbols and Definitions*, MOODY'S INV'R SERV. 6 (June 2018), https://www.moodys.com/researchdocumentcontentpage.aspx?docid=PBC_79004.

[40] Tr. 414 (Aquila).

[41] *Id.* at 460, 485 (Aquila); JX0088.0002.

[42] Tr. 461 (Aquila).

[43] PTO ¶ 222.

[44] *Id.* ¶ 224; JX0174.0002-03.

fulfill the Solera requirements because of the pervasive founder[']s culture found there. . . . Solera possibly couldn't exist without Tony."[45] Although the Compensation Committee was looking for a solution to address Aquila's underwater stock options, they ultimately "didn't get it done."[46]

### F. Aquila Privately Explores a Sale of Solera

Around the time that Aquila complained to the Board about his compensation, he began to engage in informal discussions with private equity firms regarding a potential transaction to take the Company private. In December 2014, Aquila was introduced to David Baron, an investment banker at Rothschild Inc. ("Rothschild").[47] Aquila and Baron met again in January 2015, when they "talked through a bunch of buy-side ideas" and Aquila expressed his frustration at the disconnect between Solera's stock price performance relative to its peers and his own views on the Company's growth opportunities.[48]

In March 2015, Aquila was introduced to Orlando Bravo, a founder of the private equity firm Thoma Bravo LLC ("Thoma Bravo"), and Robert Smith, the

---

[45] JX0174.0002.

[46] Tr. 464 (Aquila).

[47] PTO ¶ 251.

[48] *Id.* ¶ 252.

11

founder of Vista.[49]  Before these two meetings, Aquila was aware that both Thoma

Bravo and Vista recently had launched new multi-billion dollar funds.[50]

On April 29, 2015, Baron contacted Brett Watson, the head of Koch Equity,

to tell him, without identifying Solera as the target, about an opportunity to invest in

preferred equity.[51]  Baron wrote in an email to Watson:  "I'd like you to speak for as

much of pref[erred stock] as possible – Ceo objective is to try to get control back[.]

I'm going to clear it w[ith] chairman/ceo next week."[52]

On May 4, 2015, Baron travelled to Aquila's ranch in Jackson Hole,

Wyoming, bringing with him a presentation book that included leverage buyout

("LBO") analyses that the two had previously discussed.[53]  Two days later, during

an earnings call on May 6, Aquila raised the possibility of taking Solera private as a

means of returning money to its stockholders while still pursuing its growth strategy:

> Q (Analyst): And just if I can bring that around to [the Solera CFO's] comment about being opportunistic in share repurchases when you think the stock is detached from intrinsic value, you haven't bought a lot of stock.  So how do we square that circle in terms of what you think the Company is worth today?
>
> A (Aquila):  Look, you're bringing up a great point.  So, look, it is a chicken-or-egg story.  We're going to make some of you happy, which

---

[49] Tr. 480 (Aquila); PTO ¶¶ 258-60.

[50] Tr. 481-84 (Aquila).

[51] PTO ¶ 262.

[52] JX0208.0002.

[53] Tr. 500-01 (Aquila); JX1120.0004, 17.

12

we're trying to go down—we're trying to keep the ball down the middle of the fairway. We definitely like to hit the long ball as much as we can. But in reality, we have to do what we're doing, and we have to thread the needle the way we are. Our only other alternative is either to take up leverage, buy stock right now. That's going to cause a ratings issue. That's going to cause some dislocation. We want to buy content because we want double-digit businesses in the emerging content world as apps take a different role on your phone to manage your risks and your asset. So when you think of that, we've done a decent job. We bought, I don't know, $300 million worth of stock back since we did the stock buying program, and our average price is, like, $52, $53.

So we're kind of dealing with all the factors—we got the short game playing out there. And we've got to thread the needle. ***And the only other option to that is to go private and take all the shares out***.[54]

Aquila testified that this comment was "not preplanned," and he was not "trying to suggest that [going private] was a decision that had been made."[55]

A few days later, on May 11, 2015, Aquila met with Smith from Vista and his partner Christian Sowul in Austin, Texas.[56] After the meeting, Sowul followed up with Baron, saying "we are very interested. [T]ony sounded like now is the time. [N]ext 4-6 weeks."[57]

Also on May 11, the Board commenced a series of meetings and dinners in Dallas, Texas.[58] Before these meetings, Aquila discussed with every Board member

---

[54] JX0214.0014-15 (emphasis added).

[55] Tr. 424-25 (Aquila).

[56] JX0251.0001.

[57] JX0234.0001.

[58] Tr. 762-63 (Yarbrough).

the possibility of pursuing strategic alternatives, given that Solera was "out of runway" to execute its growth-by-acquisition strategy.[59] Company director Stuart Yarbrough encouraged Aquila to have these conversations with the other directors, and explained that the Board felt Solera was "being criticized in the market" and knew that the Company was paying higher multiples for larger acquisitions.[60]

On May 12, 2015, Company director Michael Lehman emailed Yarbrough and Larry Sonsini of the law firm Wilson Sonsini Goodrich & Rosati about the possibility of retaining his firm to assist in reviewing strategic alternatives. Lehman stated in the email: "Tony and the board have just begun conversations about 'evaluating strategic alternatives,'" of which "[o]ne of the more attractive conceptual alternatives is a 'going private,' which would likely mean that the CEO would have significant stake in that entity [] (think Dell computer type transaction)."[61]

In an executive session on May 13, the Board unanimously agreed that Aquila should "test the waters" with financial sponsors.[62] In doing so, the Board recognized that Aquila would probably have a significant equity stake in a private Solera, posing an "inherent" conflict in his outreach to private equity firms.[63] The Board authorized

[59] *Id.* at 425-27 (Aquila), 760-62 (Yarbrough).

[60] *Id.* at 862-64 (Yarbrough).

[61] JX0250.0003.

[62] Tr. 428-29 (Aquila), 762-63, 816 (Yarbrough).

[63] Tr. 829-31 (Yarbrough); JX0250.0003.

14

Aquila to "put together a target list" of large private equity firms and to "go have discussions and see what the interest was."[64] The Board decided to start with private equity firms and add strategic firms later in the process because it believed that strategic firms presented a greater risk of leaks[65] and an interested strategic bidder could get up to speed quickly.[66] The Board also wanted to focus on larger private equity firms to avoid the complexity of firms having to partner with each other.[67] At this stage, the Board prohibited "any use of nonpublic information."[68]

### G. A Special Committee is Formed after Aquila "Tests the Waters"

Between May 13 and June 1, 2015, Aquila, with assistance from Rothschild, contacted nine private equity firms: Pamplona, Silver Lake, Apax, Access Industries, Hellman & Friedman, Vista, Blackstone, CVC Capital Partners, and Thoma Bravo.[69] Aquila and Rothschild had follow-up contact with at least Silver Lake,[70] Blackstone,[71] and Thoma Bravo[72] between June 1 and July 14, 2015. After

---

[64] Tr. 865 (Yarbrough).

[65] *Id.* at 764 (Yarbrough).

[66] *Id.* at 764-65 (Yarbrough).

[67] *Id.* at 865 (Yarbrough).

[68] *Id.* at 764 (Yarbrough).

[69] PTO ¶¶ 268, 271-78.

[70] *Id.* ¶ 279.

[71] *Id.* ¶¶ 277, 280, 282.

[72] *Id.* ¶¶ 278, 283-84.

his meeting with Aquila, Orlando Bravo emailed Baron, saying "Unreal meeting.  I love Tony man.  We want to do this deal."[73]  On July 18, 2015, Aquila reported back to the Board that Thoma Bravo was going to make an offer for Solera.[74]

On July 19, 2015, Thoma Bravo submitted an indication of interest to purchase Solera at a price between $56-$58 per share.  In the letter submitting their bid, Thoma Bravo stated that they "are contemplating this deal solely in the context of being able to partner with Tony Aquila and his management team."[75]

On July 20, 2015, the Board discussed the indication of interest received from Thoma Bravo and formed a special committee of independent directors to review the Company's strategic alternatives (the "Special Committee").[76]  The Special Committee consisted of Yarbrough (Chairman), Dattilo, and Patrick Campbell, each of whom had served on multiple boards and had extensive M&A experience.[77]  The Special Committee was granted the "full power and authority of the Board" to review, evaluate, negotiate, recommend, or reject any proposed transaction or strategic alternatives.[78]  The Board resolution establishing the Special Committee

---

[73] JX0315.0001.

[74] Tr. 526-27 (Aquila).

[75] PTO ¶ 285.

[76] *Id*. ¶¶ 286-87.  The written consent establishing the Special Committee is dated July 23, 2015 (*see* JX0359), but it is stipulated that it was formed on July 20, 2015.  PTO ¶ 287.

[77] PTO ¶ 287; Tr. 754-56, 771-772 (Yarbrough).

[78] JX0359.0002.

further provided that "the Board shall not recommend a Possible Transaction or alternative thereto for approval by the Company's stockholders or otherwise approve a Possible Transaction or alternative thereto without a prior favorable recommendation of such Possible Transaction or alternative thereto by the Special Committee."[79]

## H.    The Special Committee Begins its Work

On July 30, 2015, the Special Committee met with its legal advisors, Sullivan & Cromwell LLP and Richards, Layton & Finger P.A., and financial advisor Centerview Partners LLC ("Centerview").[80] Rothschild remained active in the sales process and was formally engaged to represent the Company,[81] but, in reality, it also continued to represent Aquila personally.[82]

At its July 30 meeting, the Special Committee approved a list of potential buyers to approach, including six strategic companies that were selected based on their business initiatives and stated future plans, and six financial sponsors (including Vista) that were selected based on their experience and interest in the technology and information services industry and their capability to execute and

---

[79] *Id.*

[80] Tr. 776-78 (Yarbrough); PTO ¶ 289.

[81] JX0625; JX0673.0020; JX1161.0001. Both Centerview and Rothschild each were paid approximately $25 million in advisory fees. JX0673.0020.

[82] Tr. 568 (Aquila); JX1170.

finance a transaction of this size.[83] The Special Committee also distributed to management a short document that Sullivan & Cromwell prepared concerning senior management contacts with prospective bidders, which, aptly for a company focused on the automotive industry, was referred to as the "Rules of the Road."[84] The document stated, among other things, that "senior management must treat potential Bidders equally" and refrain from "any discussions with any Bidder representatives relating to any future compensation, retention or investment arrangements, without approval by the independent directors."[85]

Between July 30 and August 4, 2015, Centerview contacted 11 private equity firms and 6 potential strategic bidders, including Google and Yahoo!, the two that Special Committee Chair Yarbrough believed were most likely to bid.[86] Aquila already had "tested the waters" with some of the private equity firms that the Special Committee contacted. All six strategic firms contacted declined to explore a transaction involving Solera.[87] At this time, the Special Committee did not contact IHS Inc. ("IHS"), another possible strategic acquirer, because IHS was one of

---

[83] PTO ¶ 289.

[84] Tr. 782-83 (Yarbrough); JX0380.0003-05.

[85] JX0380.0005.

[86] PTO ¶ 295; Tr. 870-71 (Yarbrough).

[87] PTO ¶ 298.

Solera's key competitors and the Special Committee had "a low level of confidence" in IHS's ability to finance a transaction.[88]

From time to time, Aquila, through Rothschild and his legal counsel, Kirkland & Ellis LLP,[89] apprised the Special Committee on his thoughts about the sales process. On July 30, 2015, Baron told the Special Committee's legal and financial advisors in an email that Aquila did not want IHS included in the sales process, stating "fishing expedition, too competitive, need 50% stock . . ."[90]

On August 3, 2015, Aquila's counsel sent the Special Committee a proposed "Management Retention Program."[91] This proposal stated that "an incremental $75 million cash retention pool" should be created to align management and shareholder incentives, and to "enhance impartiality of management among all potential buyers."[92] The proposal warned that under the current compensation plan, "the program inadequately aligns management's interests with those of stockholders and exposes the Company to risks of losing key managers through closing" of a transaction.[93] Solera did not implement this proposed "Management Retention

---

[88] Tr. 780-82 (Yarbrough).

[89] JX1170.

[90] JX0378.0001.

[91] Tr. 546 (Aquila); JX0402.

[92] JX0402.0003, 07.

[93] JX0402.0003.

19

Program," but the Compensation Committee did award Aquila a $15 million bonus in August 2015.[94]

## I. The Special Committee Solicits First-Round Bids and News of the Sales Process Leaks

By August 11, 2015, Yarbrough viewed "the state of the world to be one where if there's going to be a deal, it's going to be with a private equity firm."[95] On August 10, 2015, at the direction of the Special Committee, Centerview sent a letter to the five remaining parties inviting them to submit first-round bids by August 17, 2015.[96] These parties had signed confidentiality agreements and were provided Board-approved five-year projections for the Company, which were based on projections created in the normal course of business but then modified in connection with the sales process (the "Hybrid Case Projections").[97] Before the August 17 bid deadline, Baron spoke to certain potential bidders directly without involving Centerview.[98]

---

[94] Tr. 558, 589 (Aquila).

[95] *Id.* at 854 (Yarbrough).

[96] PTO ¶ 299; JX0756.0044.

[97] PTO ¶ 388; JX0445.0005.

[98] *See* JX0467.0001 (Silver Lake); JX0456.0001 (Pamplona).

By August 17, 2015, two potential bidders had dropped out of the sales process, believing "that they would not be able to submit competitive bids."[99] The remaining three financial sponsors provided indications of interest: Vista offered $63 per share, Thoma Bravo offered $60 per share, and Pamplona offered $60-$62 per share.[100] Each made clear that they wanted Aquila's participation in the deal.[101]

On August 19, 2015, news of the sales process leaked when Bloomberg reported that Solera was "exploring a sale that has attracted interest from private equity firms."[102] The next day, the Company issued a press release announcing that it had formed the Special Committee and that it was contemplating a sale.[103] Also on August 20, the Financial Times reported that Vista was "considering a bid of $63 per share" and that Thoma Bravo and Pamplona were "considering separate bids for $62 per share."[104]

In a further development on August 20, Advent International Corporation, a private equity firm, reached out to Centerview and Rothschild separately to express

---

[99] JX0465.0001.

[100] PTO ¶ 302.

[101] JX0340.0003; JX0464.0005, 08.

[102] PTO ¶ 305.

[103] *Id.* ¶ 306.

[104] JX0499.0002.

interest in the Company.[105] Centerview confirmed to Baron that it planned to ignore the inquiry,[106] about which the members of the Special Committee were never informed.[107] The Special Committee also was not made aware of interest that Providence Equity Partners, L.L.C.,[108] another private equity firm, expressed to Centerview on August 26.[109] When Centerview made Baron aware of this inquiry, he responded: "Too late obv[iously] but Tony not a fan . . ."[110] Neither Advent nor Providence gave any indication as to the price they would be willing to pay for Solera or the amount of time they would need to get up to speed.[111]

During the August 22-23, 2015 weekend, Smith traveled to Aquila's ranch en route to his own ranch in Colorado.[112] Before the meeting, Smith's team at Vista researched the size of the option pools that Vista had offered management in its "recent take privates" so that Smith would "know the comps before his meeting with [T]ony."[113] Aquila did not have authorization from the Special Committee to discuss

---

[105] JX0497.0001-02 (August 20, 2015 email from Advent to Centerview); JX0517.0001 (August 21, 2015 email referencing Advent call to UK head of Rothschild).

[106] JX0497.0001.

[107] Tr. 844-45 (Yarbrough).

[108] *Id.* at 845-46 (Yarbrough).

[109] JX0556.0001.

[110] *Id.*

[111] JX0497; JX0556.

[112] Tr. 597-98 (Aquila); JX0523; JX0525.

[113] JX0525.0002.

his post-transaction compensation at this time.[114] Shortly after the meeting, Vista began to model a 9% option pool with a 1% long-term incentive plan (LTIP), up from the 5% option pool with a 1% LTIP that Vista had modeled before Aquila's meeting with Smith.[115]

## J.    IHS Expresses Interest in a Potential Transaction

On August 21, 2015, IHS contacted Centerview to express its interest in a potential acquisition of Solera at an unspecified valuation and financing structure.[116] By August 23, IHS suggested that it would be able to submit a bid in excess of $63 per share, and it indicated that it could complete due diligence and execute definitive transaction documents within ten calendar days despite not yet having received non-public information.[117] The parties entered into a confidentiality agreement on August 24.[118]

On August 26, 2015, senior representatives of IHS, including its CFO, attended a meeting with the Company's management, before which Aquila had a one-on-one conversation with IHS's CFO for 90 minutes.[119] Centerview requested

---

[114] Tr. 833 (Yarbrough).

[115] JX0525.0001; JX0541.0001.

[116] PTO ¶ 307.

[117] *Id.* ¶ 308.

[118] *Id.* ¶ 309.

[119] *Id.* ¶ 312.

numerous times that IHS's CEO Jerre Stead attend the management meeting, but he declined even though the acquisition would have been the largest in IHS's history.[120] By August 27, Solera had provided IHS with non-public Company information, including the Hybrid Case Projections.[121]

On September 1, IHS submitted a bid of $55-$58 per share, comprised of 75% cash and 25% stock, and included "highly confident" letters from financing sources.[122] On September 2, Aquila travelled separately to meet with Stead personally, who commented that IHS was "looking at another big deal as well."[123] The next day, IHS submitted a revised bid of $60 per share, but did not specify the mix of consideration and did not include any indication of financing commitments.[124] IHS said it could complete diligence "within a matter of days."[125]

---

[120] *Id.* ¶ 312; Tr. 441 (Aquila), 793 (Yarbrough).

[121] PTO ¶ 313.

[122] *Id.* ¶ 317.

[123] Tr. 442-44 (Aquila).

[124] PTO ¶ 321.

[125] JX0611.0002.

### K.    The Special Committee Negotiates with Potential Buyers

On September 4, 2015, Vista and Thoma Bravo submitted revised bids.[126] Pamplona had dropped out of the sales process by this point,[127] and the Special Committee felt like it was "moving backwards" in its negotiations with IHS.[128]

Both of the active bidders lowered their offers.  Thoma Bravo lowered its bid to $56 per share, attributing the drop to "challenges in availability and terms of financing (both debt and equity) due in part to turbulence in global financial markets."[129]  Vista lowered its bid to $55 per share, but subsequently indicated that it could increase its price to $56 per share.[130]  Vista explained that it dropped its bid because of changes to Solera's balance sheet, increased financing costs, and a decline in Vista's forecasted EBITDA for Solera.[131]  Unbeknownst to Solera, one of the reasons Vista lowered its bid is that it had made a spreadsheet error in its financial model before submitting its first-round bid, resulting in the model overstating Solera's future equity value by approximately $1.9 billion.[132]  If this error had been

---

[126] PTO ¶¶ 322, 324.

[127] *Id.* ¶ 311.

[128] Tr. 796-97 (Yarbrough).

[129] PTO ¶¶ 322-23.

[130] *Id*. ¶ 324.

[131] JX0620.0001-02; JX0626.0001.

[132] Tr. 934-35, 964-67 (Sowul).  Petitioners question the veracity of this explanation, but I found Sowul's testimony on the point to be credible and one of petitioners' own experts confirmed the spreadsheet error.  *Id.* at 301-04 (Buckberg).

noticed and corrected, Vista's first-round bid would have been closer to $55 per share, rather than $63 per share.[133]

On September 5, 2015, Aquila signaled that he was willing to roll over $15 million of his Solera shares in a transaction with any bidder.[134] That day, the Special Committee met[135] and decided to press for more from the bidders, proposing to Vista that it either raise its price to $58 per share, or agree to a go-shop and reduced termination fee to enable Solera to continue discussions with IHS.[136] Vista agreed to the go-shop and the termination fee reduction on September 7, but also told Centerview that day that one of its anticipated sources of equity financing had withdrawn its commitment and that it would need additional time to obtain replacement financing to support its bid.[137]

On September 8, Vista lowered its bid to $53 per share.[138] Vista told Solera that its bid would expire at midnight, and that "[a]fter midnight, we will not be spending any more time on" Solera.[139] The Special Committee rejected Vista's bid

---

[133] *Id.* at 934-35 (Sowul).

[134] PTO ¶¶ 382-84; Tr. 589 (Aquila); JX0623.

[135] JX0628.

[136] PTO ¶ 325.

[137] *Id.* ¶¶ 329-31.

[138] *Id.* ¶ 332.

[139] JX0638.0001.

as inadequate that same day,[140] and decided "to let the process play out."[141] The Special Committee set September 11, 2015 as a deadline for Vista and Thoma Bravo to make final bids.[142] On September 9, Bloomberg reported that Solera had received bids from Vista and Thoma Bravo, and that the Company was "nearing a deal to sell itself for about $53 a share."[143]

When September 11 arrived, Thoma Bravo offered $54 per share, expiring at midnight and contingent on Solera "shutting off dividends" and reducing advisory fees.[144] The Special Committee said "no."[145] The press again reported in real time, with Reuters writing that Vista and Thoma Bravo had "made offers that failed to meet Solera's valuation expectations," and that Solera was "trying to sell itself to another company"—IHS—"rather than an investment firm."[146]

The next morning, on September 12, Vista submitted an all-cash, fully financed revised bid of $55.85 per share that also included the go-shop and termination fee provisions the Special Committee had requested.[147] The Special

---

[140] PTO ¶ 334.

[141] Tr. 969-70 (Sowul).

[142] *Id.* at 806 (Yarbrough).

[143] JX0644.0001.

[144] PTO ¶ 338; Tr. 806 (Yarbrough).

[145] Tr. 807 (Yarbrough).

[146] JX0651.0001.

[147] PTO ¶ 339; JX0756.0052; Tr. 807-08 (Yarbrough).

Committee tried to push Vista up to $56 per share, but Vista refused, saying $55.85 was its best and final offer.[148]  Centerview opined that $55.85 per share was fair, from a financial point of view, to Solera stockholders.[149]  Later in the day on September 12, the Special Committee accepted Vista's offer after receiving Centerview's fairness opinion, and the Board approved the transaction.[150]  On September 13, the Company and Vista entered into a definitive merger agreement (the "Merger Agreement").[151]

### L.    The Go-Shop Period Expires and the Merger Closes

On September 13, 2015, Solera announced the proposed Merger.[152]  The press release stated that the purchase price valued Solera at approximately $6.5 billion, including net debt, "represent[ing] an unaffected premium of 53% over Solera's closing share price of $36.39 on August 3, 2015."[153]

In advance of the press release, Baron sent a celebratory email to his colleagues, in which he noted "we were the architects with the CEO from the beginning as to how to engineer the process from start to finish."[154]  The next

---

[148] PTO ¶ 339.

[149] *Id.* ¶ 341; Tr. 807-08 (Yarbrough); JX0661.0001-04.

[150] *Id.* ¶¶ 346-47.

[151] *Id.* ¶ 348.

[152] JX0681.

[153] JX0681.0001.

[154] JX0670.0002.

morning, an internal email of the Fir Tree petitioners praised the transaction as yielding a "Good price!"[155]

The Merger Agreement provided for a 28-day go-shop period during which the termination fee would be 1% of the equity value for any offer made by IHS, a reduction from the 3% termination fee applicable to any other potential buyer.[156] The Special Committee reached out to IHS the day after signing the Merger Agreement and gave IHS nearly full access to the approximately 12,000-document data room that the private equity firms had been given access to during the pre-signing sales process.[157]

On September 29, 2015, with two weeks left in the go-shop, IHS informed Solera that it would not pursue an acquisition of the Company. IHS noted that it "was appreciative of the go-shop provisions negotiated in the merger agreement . . . and the fact that [Solera] had provided equal access to information in order for IHS to consider a bid."[158] On October 5, 2015, Solera issued its preliminary proxy

---

[155] JX0683.0001.

[156] PTO ¶ 350.

[157] *Id.* ¶ 351; Tr. 811 (Yarbrough). Solera withheld six documents. Four of the six documents concerned Digital Garage, a strategically sensitive new smartphone application, and the other two concerned personnel matters. Tr. 811 (Yarbrough); PTO ¶ 139-44.

[158] PTO ¶ 354.

statement, which disclosed a summary of the Hybrid Case Projections.[159]  The go-shop expired on October 11, without Solera receiving any alternative proposals.[160]

On October 15, 2015, Vista sent Aquila a proposed compensation package, offering Aquila the opportunity to obtain up to 6% of Solera's fully-diluted equity.[161] This amount was later revised up, with Vista offering Aquila up to 10% of the fully-diluted equity.  Under the revised plan, Aquila would invest $45 million in the deal— $15 million worth of his shares of Solera and $30 million borrowed from Vista.[162] Vista's proposal positioned Aquila to earn up to $969.6 million over a seven-year period if Vista achieved a four-times cash-on-cash return.[163]

On October 30, 2015, Solera issued its definitive proxy statement concerning the proposed Merger, which also included a summary of the Hybrid Case Projections.[164]  On December 8, Solera's stockholders voted to approve the Merger. Of the Company's outstanding shares, approximately 65.4% voted in favor, approximately 10.9% voted against, and approximately 3.4% abstained.[165]  The

---

[159] *Id.* ¶ 355.

[160] *Id.* ¶ 356.

[161] JX0744.0001, 03; Tr. 611-614 (Aquila).

[162] PTO ¶¶ 382-387; JX0760.0004.

[163] JX0760.0004, 09-10.

[164] PTO ¶ 5; JX0756.0069.

[165] PTO ¶¶ 6-7.

Merger closed on March 3, 2016.[166] The next day, Aquila signed a new employment agreement with Solera.[167]

## II.  PROCEDURAL POSTURE

On March 7 and March 10, 2016, petitioners filed their petitions for appraisal. The court consolidated the petitions on March 30, 2016.  A five-day trial was held in June 2017, and post-trial argument was held on December 4, 2017.

At the conclusion of the post-trial argument, the court asked the parties to confer to see if they could agree on an expert the court might appoint to opine on a significant issue of disagreement concerning the methods the parties' experts used to determine the terminal period investment rate in their discounted cash flow analyses.  On December 19, 2017, the parties advised the court that they were unable to reach agreement on a suggested expert and each submitted two candidates for the court's consideration.

On February 22, 2018, Solera filed a motion requesting the opportunity to submit supplemental briefs to address the implications of certain appraisal decisions issued after the post-trial argument.  The court granted this motion on February 26, 2018, noting in its order that it had "made no decision about whether to proceed with

---

[166] *Id.* ¶ 1.

[167] JX0855.0001.

31

an independent expert" and would "revisit the issue after reviewing the supplemental submissions."[168] Supplemental briefing was completed on April 6, 2018.[169]

## III.  ANALYSIS

### A.  Legal Standard

Petitioners request appraisal of their shares of Solera under 8 *Del. C.* § 262. "An action seeking appraisal is intended to provide shareholders who dissent from a merger, on the basis of the inadequacy of the offering price, with a judicial determination of the fair value of their shares."[170] Respondent has not disputed petitioners' eligibility for an appraisal of their shares.

In an appraisal action, the court has a statutory mandate to:

[D]etermine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value.  In determining such fair value, the Court shall take into account all relevant factors.[171]

Appraisal excludes any value resulting from the merger, including synergies that may arise,[172] because "[t]he basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz.,

---

[168] Dkt. 122.

[169] Dkt. 125.

[170] *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1142 (Del. 1989) (citation omitted).

[171] 8 *Del. C.* § 262(h).

[172] *See M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999).

his proportionate interest in a going concern."[173] In valuing a company as a "going concern" at the time of a merger, the court must take into consideration the "operative reality"[174] of the company, viewing the company as "occupying a particular market position in the light of future prospects."[175] A dissenting stockholder is then entitled to his proportionate interest in the going concern.[176]

In using "all relevant factors" to determine fair value, the court has significant discretion to use the valuation methods it deems appropriate, including the parties' proposed valuation frameworks, or one of the court's own fashioning.[177] This court has relied on a number of different approaches to determine fair value, including comparable company and precedent transaction analyses, a discounted cash flow model, and the merger price.[178] "This Court may not adopt at the outset an 'either-or' approach, thereby accepting uncritically the valuation of one party, as it is the

---

[173] *Tri-Cont'l Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950).

[174] *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525 (Del. 1999).

[175] *Matter of Shell Oil Co.*, 607 A.2d 1213, 1218 (Del. 1992).

[176] *Cavalier Oil*, 564 A.2d at 1144.

[177] *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at *15 (Del. Ch. Jan. 30, 2015) (citing *Glob. GT LP v. Golden Telecom, Inc.* 11 A.3d 214, 218 (Del. 2010)).

[178] *See Laidler v. Hesco Bastion Envtl., Inc.*, 2014 WL 1877536, at *6 (Del. Ch. May 12, 2014) (compiling authorities); *see also In re Lane v. Cancer Treatment Ctrs. of Am., Inc.*, 1994 WL 263558, at *2 (Del. Ch. May 25, 1994) ("[R]elevant factors to be considered include 'assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.'") (quoting *Weinberger*, at 711).

Court's duty to determine the core issue of fair value on the appraisal date."[179] "In an appraisal proceeding, the burden to establish fair value by a preponderance of the evidence rests on both the petitioner and the respondent."[180]

### B. *DFC*, *Dell*, and Recent Court of Chancery Appraisal Decisions

Over the past year, the Delaware Supreme Court has issued two decisions providing important guidance for the Court of Chancery in appraisal proceedings: *DFC Global Corporation v. Muirfield Value Partners, L.P.*[181] and *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*[182] Given their importance, a brief discussion of each case is appropriate at the outset.

In *DFC*, petitioners sought appraisal of shares they held in a publicly traded payday lending firm, DFC, that was purchased by a private equity firm.[183] This court attempted to determine the fair value of DFC's shares by equally weighting three measures of value: a discounted cash flow model, a comparable company analysis, and the transaction price.[184] The court gave equal weight to these three measures of

---

[179] *In re Appraisal of Metromedia Int'l Gp., Inc.*, 971 A.2d 893, 899-900 (Del. Ch. 2009) (citation omitted).

[180] *Laidler*, 2014 WL 1877536, at *6 (citing *M.G. Bancorporation., Inc., v. Le Beau*, 737 A.2d at 520).

[181] 172 A.3d 346 (Del. 2017).

[182] 177 A.3d 1 (Del. 2017).

[183] *DFC*, 172 A.3d at 348.

[184] *In re Appraisal of DFC Glob. Corp.*, 2016 WL 3753123, at *1 (Del. Ch. July 8, 2016), *rev'd*, *DFC*, 172 A.3d 346.

value because it found that each similarly suffered from limitations arising from the tumultuous regulatory environment that was swirling around DFC during the period leading up to its sale.[185] The court's analysis resulted in a fair value of DFC at approximately 8% above the transaction price.[186]

The Delaware Supreme Court reversed and remanded to the trial court.[187] Based on its own review of the trial record, the Supreme Court held that the Court of Chancery's decision to afford only one-third weight to the transaction price was "not rationally supported by the record,"[188] explaining:

> Although there is no presumption in favor of the deal price . . . economic principles suggest that the best evidence of fair value was the deal price, as it resulted from an open process, informed by robust public information, and easy access to deeper, non-public information, in which many parties with an incentive to make a profit had a chance to bid.[189]

---

[185] *See id.* at \*21 ("Each of these valuation methods suffers from different limitations that arise out of the same source: the tumultuous environment in the time period leading up to DFC's sale. As described above, at the time of its sale, DFC was navigating turbulent regulatory waters that imposed considerable uncertainty on the company's future profitability, even its viability. Some of its competitors faced similar challenges. The potential outcome could have been dire, leaving DFC unable to operate its fundamental businesses, or could have been very positive, leaving DFC's competitors crippled and allowing DFC to gain market dominance. Importantly, DFC was unable to chart its own course; its fate rested largely in the hands of the multiple regulatory bodies that governed it. Even by the time the transaction closed in June 2014, DFC's regulatory circumstances were still fluid.").

[186] *DFC*, 172 A.3d at 360-61.

[187] *Id.* at 351.

[188] *Id.* at 349.

[189] *Id.*

35

The Supreme Court further explained that the purpose of appraisal "is not to make sure that the petitioners get the highest conceivable value," but rather "to make sure that they receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction."[190]

According to the Supreme Court, "[m]arket prices are typically viewed superior to other valuation techniques because, unlike, e.g., a single person's discounted cash flow model, the market price should distill the collective judgment of the many based on all the publicly available information about a given company and the value of its shares."[191] The "collective judgment of the many" may include that of "equity analysts, equity buyers, debt analysts, [and] debt providers."[192] The Supreme Court cautioned that "[t]his, of course, is not to say that the market price is always right, but that one should have little confidence she can be the special one able to outwit the larger universe of equally avid capitalists with an incentive to reap rewards by buying the asset if it is too cheaply priced."[193]

Several months after deciding *DFC*, the Supreme Court reiterated the same appraisal thesis in *Dell,* where the trial court had reached a determination of fair

---

[190] *Id*. at 370-71.

[191] *Id*. at 369-70.

[192] *Id.* at 373.

[193] *Id*. at 367.

value at approximately 28% above the transaction price.[194]  In *Dell*, the Supreme

Court found that the Court of Chancery erred by relying completely on a discounted

cash flow analysis and affording zero weight to market data, *i.e.*, the stock price and

the deal price, because "the evidence suggests that the market for Dell's shares was

actually efficient and, therefore, likely a possible proxy for fair value."[195]  With

respect to the company's stock price, the Supreme Court explained:

> Dell's stock traded on the NASDAQ under the ticker symbol DELL.
> The Company's market capitalization of more than $20 billion ranked
> it in the top third of the S&P 500.  Dell had a deep public float and was
> actively traded as more than 5% of Dell's shares were traded each week.
> The stock had a bid-ask spread of approximately 0.08%.  It was also
> widely covered by equity analysts, and its share price quickly reflected
> the market's view on breaking developments.[196]

The Supreme Court thus held that "the record does not adequately support the Court

of Chancery's conclusion that the market for Dell's stock was inefficient and that a

valuation gap in the Company's market trading price existed in advance of the

lengthy market check, an error that contributed to the trial court's decision to

disregard the deal price."[197]

---

[194] *In re Appraisal of Dell Inc.*, 2016 WL 3186538, at *1, 18 (Del. Ch. May 31, 2016), *rev'd*, *Dell*, 177 A.3d 1.

[195] *Dell*, 117 A.3d at 6.

[196] *Id*. at 7.

[197] *Id*. at 27.

With respect to the deal price, the Supreme Court said that "it is clear that Dell's sale process bore many of the same objective indicia of reliability" as the one in *DFC*, which "included that 'every logical buyer' was canvassed, and all but the buyer refused to pursue the company when given the opportunity; concerns about the company's long-term viability (and its long-term debt's placement on negative credit watch) prevented lenders from extending debt; and the company repeatedly underperformed its projections."[198]  Given leaks in the press that Dell was exploring a sale, moreover, the world was put on notice of the possibility of a transaction so that "any interested parties would have approached the Company before the go-shop if serious about pursuing a deal."[199]

Dell's bankers canvassed the interest of 67 parties, including 20 possible strategic acquirers during the go-shop, and the go-shop's overall design was relatively open and flexible.[200]  The special committee had the power to say "no," and it convinced the eventual buyer to raise its bid six times.[201]  The Supreme Court thus found that "[n]othing in the record suggests that increased competition would have produced a better result.  [The financial advisor] also reasoned that any other

---

[198] *Id*. at 28 (citing *DFC*, 172 A.3d at 374-77); *see also id.* ("[The financial advisor] did not initially solicit the interest of strategic bidders because its analysis suggested none was likely to make an offer.").

[199] *Id.*

[200] *Id.* at 29.

[201] *Id*. at 28.

financial sponsor would have bid in the same ballpark as [the buyer]."[202]

Significantly, the Court did not view a dearth of strategic buyer interest as negatively

impacting the reliability of the deal price, explaining:

> Fair value entails at minimum a price some buyer is willing to pay—
> not a price at which no class of buyers in the market would pay. The
> Court of Chancery ignored an important reality: if a company is one
> that no strategic buyer is interested in buying, it does not suggest a
> higher value, but a lower one.[203]

In sum, the Supreme Court held that "[o]verall, the weight of evidence shows

that Dell's deal price has heavy, if not overriding, probative value."[204]   It

summarized its decision as follows:

> In so holding, we are not saying that the market is always the best
> indicator of value, or that it should always be granted some weight. We
> only note that, when the evidence of market efficiency, fair play, low
> barriers to entry, outreach to all logical buyers, and the chance for any
> topping bidder to have the support of Mr. Dell's own votes is so
> compelling, then failure to give the resulting price heavy weight
> because the trial judge believes there was mispricing missed by all the
> Dell stockholders, analysts, and potential buyers abuses even the wide
> discretion afforded the Court of Chancery in these difficult cases.[205]

---

[202] *Id.*

[203] *Id.* at 29 (citation omitted).

[204] *Id.* at 30. *See also id.* at 23 ("In fact, the record as distilled by the trial court suggests that the deal price deserved heavy, if not dispositive, weight.").

[205] *Id.* at 35.

Shortly after *Dell* was decided, the Court of Chancery rendered appraisal decisions in *Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.*[206] and *In re Appraisal of AOL Inc.*[207]

In *Aruba*, the court observed that the Supreme Court's decisions in *DFC* and *Dell* "endorse using the deal price in a third-party, arm's-length transaction as evidence of fair value" and "caution against relying on discounted cash flow analyses prepared by adversarial experts when reliable market indicators are available."[208] The court further observed that *DFC* and *Dell* "recognize that a deal price may include synergies, and they endorse deriving an indication of fair value by deducting synergies from the deal price."[209] Rather than hold that the deal price less synergies represented fair value, however, the *Aruba* court determined that fair value was "the unaffected market price" of petitioners' shares, which was more than 30% below the transaction price.[210] The court identified "two major shortcomings" of its "deal-price-less-synergies figure" that supported this conclusion and explained its rationale for using the "unaffected market price" as follows:

---

[206] 2018 WL 922139 (Del. Ch. Feb. 15, 2018), *reargument denied*, 2018 WL 2315943 (Del. Ch. May 21, 2018).

[207] 2018 WL 1037450 (Del. Ch. Feb. 23, 2018).

[208] 2018 WL 922139 at *1-2 (citations omitted).

[209] *Id.* at *2 (citation omitted).

[210] *Id.* at *1, 4.

First, my deal-price-less-synergies figure is likely tainted by human error. Estimating synergies requires exercises of human judgment analogous to those involved in crafting a discounted cash flow valuation. The Delaware Supreme Court's preference for market indications over discounted cash flow valuations counsels in favor of preferring market indications over the similarly judgment-laden exercise of backing out synergies.

Second, my deal-price-less-synergies figure continues to incorporate an element of value derived from the merger itself: the value that the acquirer creates by reducing agency costs. A buyer's willingness to pay a premium over the market price of a widely held firm reflects not only the value of anticipated synergies but also the value created by reducing agency costs. The petitioners are not entitled to share in either element of value, because both arise from the accomplishment or expectation of the merger. The synergy deduction compensates for the one element of value arising from the merger, but a further downward adjustment would be necessary to address the other.

Fortunately for a trial judge, once Delaware law has embraced a traditional formulation of the efficient capital markets hypothesis, the unaffected market price provides a direct route to the same endpoint, at least for a company that is widely traded and lacks a controlling stockholder. Adjusting down from the deal price reaches, indirectly, the result that the market price already provides.[211]

In *AOL*, the court similarly construed *DFC* and *Dell* to mean that where "transaction price represents an unhindered, informed, and competitive market valuation, the trial judge must give particular and serious consideration to transaction price as evidence of fair value" and that where "a transaction price is used to determine fair value, synergies transferred to the sellers must be deducted."[212] In

---

[211] *Id.* at *2-4 (internal citations, quotations, and alterations omitted).
[212] 2018 WL 1037450, at *1.

doing so, the court coined the phrase "Dell Compliant" to mean a transaction "where (i) information was sufficiently disseminated to potential bidders, so that (ii) an informed sale could take place, (iii) without undue impediments imposed by the deal structure itself."[213] The court found that the sales process did not satisfy this standard and ultimately determined the fair value of petitioners' shares based on its own discounted cash flow analysis ($48.70 per share), which was about 2.6% less than the deal price ($50 per share).[214]

## C. The Parties' Contentions

Petitioners contend that the fair value of their shares is $84.65 per share—approximately 51.6% over the deal price. Their sole support for this valuation is a discounted cash flow model prepared by their expert, Bradford Cornell, Visiting Professor of Financial Economics at the California Institute of Technology.[215] Cornell also performed a multiples-based comparable company analysis "as a reasonableness check" but gave it no weight in his valuation.[216]

---

[213] *Id.* at *8.

[214] *Id.* at *21. Just last week, the Court of Chancery similarly found in another case that flaws in a sales process leading to a merger undermined the reliability of the merger price as an indicator of fair value. *Blueblade Capital Opportunities LLC v. Norcraft Cos., Inc.*, 2018 WL 3602940, at *1-2 (Del. Ch. July 27, 2018).

[215] JX0898.0094-95, 200.

[216] JX0898.0098.

Respondent's expert was Glenn Hubbard, the Dean and Russell L. Carson Professor in Finance and Economics at the Graduate School of Business of Columbia University, as well as Professor of Economics at Columbia University. He concluded that the "best evidence of Solera's value is the market-generated Merger price [$55.85], adjusted for synergies [$1.90] to $53.95."[217] Hubbard also conducted a valuation based on a discounted cash flow model, which resulted in a valuation of $53.15 per share, but found the methodology to be less reliable in this instance.[218] Hubbard further considered, as a "check," Solera's historical valuation multiples, analysts' stock price targets, and valuation multiples from comparable companies and precedent transactions.[219]

This sharp divide of $31.50 per share between the experts' DCF models is the result of a number of disagreements regarding the proper inputs and methods to use in the analysis. The most significant disagreements are explained later.

Throughout trial and post-trial briefing, respondent consistently maintained that the best evidence of Solera's value at the time of the Merger was the deal price minus synergies. Seizing on the *Aruba* decision, respondent changed course during

[217] Resp't's Post-Trial Opening Br. 1 (Dkt. 106); *see also* JX0894.0125-26.

[218] JX0894.0126.

[219] *Id.*

supplemental briefing, arguing that "[i]n light of recent cases, the best evidence of Solera's fair value is its unaffected stock price of $36.39 per share."[220]

## D. Determination of Solera's Fair Value

I now turn to my own independent determination of the fair value of Solera's shares with the guidance from *DFC* and *Dell* in mind. Those decisions teach that deal price is "the best evidence of fair value"[221] when there was an "open process,"[222] meaning that the process is characterized by "objective indicia of reliability."[223] Such "indicia" include but, consistent with the mandate of the appraisal statute to consider "all relevant factors,"[224] are not limited to:

- "[R]obust public information,"[225] comprised of the stock price of a company with "a deep base of public shareholders, and highly active trading,"[226] and

---

[220] Resp't's Suppl. Post-Trial Br. 5 (Dkt. 123).

[221] *DFC*, 172 A.3d at 349.

[222] *Id.*

[223] *Dell*, 177 A.3d at 28.

[224] 8 *Del. C.* § 262(h) ("In determining such fair value, the Court shall take into account all relevant factors."); *see also DFC*, 172 A.3d at 364 (affirming *Golden Telecom* and restating that "§ 262(h) gives broad discretion to the Court of Chancery to determine the fair value of the company's shares, considering 'all relevant factors'").

[225] *DFC*, 172 A.3d at 349.

[226] *Id.* at 373.

the views of "equity analysts, equity buyers, debt analysts, debt providers and others."[227]

- "[E]asy access to deeper, non-public information,"[228] where there is no discrimination between potential buyers and cooperation from management helps address any information asymmetries between potential buyers.[229]

- "[M]any parties with an incentive to make a profit had a chance to bid,"[230] meaning that there was a "robust market check"[231] with "outreach to all logical buyers"[232] and a go-shop characterized by "low barriers to entry"[233] such that there is a realistic possibility of a topping bid.

- A special committee, "composed of independent, experienced directors and armed with that power to say 'no,'"[234] which is advised by competent legal and financial advisors.

---

[227] *Id.*

[228] *Id.* at 349.

[229] *Dell*, 177 A.3d at 32-34.

[230] *DFC*, 172 A.3d at 349.

[231] *Id.* at 366.

[232] *Dell*, 177 A.3d at 35.

[233] *Id.*

[234] *Id.* at 28.

- "[N]o conflicts related to the transaction,"[235] with the company purchased by a third party in an arm's length sale[236] and "no hint of self-interest."[237]

If the process was open, then "the deal price deserve[s] heavy, if not dispositive, weight."[238] This is not to say that the market is always correct: "In some cases, it may be that a single valuation metric is the most reliable evidence of fair value and that giving weight to another factor will do nothing but distort that best estimate. In other cases, it may be necessary to consider two or more factors."[239] Whichever route it takes, however, the Court of Chancery is required to "justify its methodology (or methodologies) according to the facts of the case and relevant, accepted financial principles."[240]

### 1. The Deal Price Less Synergies Deserves Dispositive Weight

For the reasons explained below, I find that the Merger was the product of an open process that, although not perfect, has the requisite objective indicia of reliability emphasized in *DFC* and *Dell*. Thus, I conclude that the deal price, minus synergies, is the best evidence of fair value and deserves dispositive weight in this

---

[235] *DFC*, 172 A.3d at 373.

[236] *Id.* at 349.

[237] *Id.*

[238] *Dell*, 177 A.3d at 23.

[239] *DFC*, 172 A.3d at 388.

[240] *Dell*, 177 A.3d at 22 (citation omitted).

case. My consideration of the evidence supporting this conclusion follows in three parts focusing on (i) the opportunity many potential buyers had to bid, (ii) the Special Committee's role in actively negotiating an arm's-length transaction, and (iii) the evidence that the market for Solera's stock was efficient and well-functioning.

### a. Many Heterogeneous Potential Buyers Had a Meaningful Opportunity to Bid

Appraisal decisions have placed weight on the deal price when the process "involved a reasonable number of participants and created credible competition" among bidders.[241] Here, Solera reached out to nine large private equity funds in May and June 2015 during the "test the waters" period.[242] Then, after Thoma Bravo submitted an indication of interest on July 19, 2015,[243] the Special Committee engaged with 18 potential bidders, 11 financial and 7 strategic firms.[244] As Hubbard testified, a "broad range of sophisticated buyers," both financial and strategic, had the chance to bid for Solera.[245] Petitioners' own expert offered no opinion "that more bidders should have been contacted."[246]

---

[241] *Merion Capital L.P. v. Lender Processing*, 2016 WL 7324170, at *18 (Del. Ch. Dec. 16, 2016).

[242] PTO ¶¶ 268, 271-78.

[243] *Id.* ¶ 285.

[244] *Id.* ¶¶ 295, 307-09.

[245] Tr. 1029-31, 1036-37 (Hubbard).

[246] *Id.* at 132 (Cornell).

47

Not only were the 18 potential bidders directly contacted and aware that Solera could be acquired at the right price, but "the whole universe of potential bidders was put on notice,"[247] with increasing specificity over time, that the Company was considering strategic alternatives.[248] Aquila publicly presaged the sales process during the Company's earnings call on the May 6, 2015,[249] and the Company confirmed it had formed a Special Committee and was contemplating a sale on August 20, 2015,[250] the day after Bloomberg reported that Solera was "exploring a sale that has attracted interest from private equity firms."[251]

The press revealed not only the identities of potential buyers, but also the approximate amounts of their bids. On August 20, 2015, for example, the Financial Times reported that Vista was "considering a bid of $63 per share," with Thoma Bravo and Pamplona "considering separate bids for $62 per share."[252] On September

---

[247] *In re Appraisal of PetSmart, Inc.*, 2017 WL 2303599, at *28 (Del. Ch. May 26, 2017); *see also* Tr. 1036 (Hubbard) ("Once a sales process became public in the Bloomberg story, anyone who wished to bid on this asset could certainly have jumped in."); *Dell*, 177 A.3d at 28 ("[G]iven leaks that Dell was exploring strategic alternatives, record testimony suggests that [Dell's banker] presumed that any interested parties would have approached the Company before the go-shop if serious about pursuing a deal.").

[248] Tr. 789 (Yarbrough) ("And then an upside of that is that everybody in the world knew that we were looking at strategic alternatives at that point.").

[249] JX0214.0014-15.

[250] PTO ¶ 306.

[251] *Id.* ¶ 305.

[252] JX0499.0002.

9, 2015, Bloomberg reported that Solera had received bids from Vista and Thoma Bravo, and that the Company was "nearing a deal to sell itself for about $53 a share."[253] Two days later, Reuters wrote that Vista and Thoma Bravo "had made offers that failed to meet Solera's valuation expectations," and that the Company was "trying to sell itself to another company"—IHS—"rather than an investment firm."[254] The visible threat of other buyers made the sales process more competitive.[255] Given these public disclosures, any potential bidder knew in essentially real time that Solera was exploring a sale and the approximate price levels of the offers.[256] Yet no one else ever seriously showed up to make a topping bid.

Petitioners point out that Advent and Providence were excluded from the sales process, but whether either would have bid competitively is unknown. Notably, when Advent and Providence expressed interest to Solera's bankers, neither provided any indication as to their ability to pay or their sources of financing; rather, their introductory emails were perfunctory, suggesting to me that they were

---

[253] JX0644.0001.

[254] JX0651.0001.

[255] *Lender Processing*, 2016 WL 7324170, at *18 ("Importantly, however, if bidders perceive a sale process to be relatively open, then a credible threat of competition can be as effective as actual competition.").

[256] Leaks of the amounts of the bids theoretically could have functioned to anchor the bidding process, but Solera never publicly confirmed the validity of these reports and petitioners have never argued that these leaks had any impact on the competitive dynamic among bidders.

just "kicking the tires."[257] There also is no evidence that either of them followed up to express any further interest in Solera, either before or during the go-shop period.[258]

The fact that only one potential strategic bidder—IHS—made a bid does not undermine the reliability of the sales process as a price discovery tool. That six potential strategic acquirers declined to explore a transaction involving Solera shows that six sophisticated, profit-motivated actors were offered the opportunity to participate in a sales process to acquire the Company, yet none was interested enough to even sign a non-disclosure agreement.[259] As noted above, our Supreme Court forcefully made this point in *Dell*:

> The Court of Chancery stressed its view that the lack of competition from a strategic buyer lowered the relevance of the deal price. But its assessment that more bidders—both strategic and financial—should have been involved assumes there was some party interested in proceeding. Nothing in the record indicates that was the case. Fair value entails at a minimum a price some buyer is willing to pay—not a price at which no class of buyers in the market would pay. The Court of Chancery ignored an important reality: if a company is one that no

---

[257] *See* JX0497; JX0556.

[258] As petitioners acknowledge, it also is doubtful whether including more financial sponsors in the sales process (beyond the eleven that the Special Committee contacted) would have meaningfully increased competition between the bidders. Pet'rs' Post-Trial Opening Br. 27-28 (Dkt. 105). *See also Lender Processing*, 2016 WL 7324170, at *17 (citation omitted) ("Financial sponsors . . . predominately use the same pricing models, the same inputs, and the same value-creating techniques.").

[259] *See DFC*, 172 A.3d at 349 ("Any rational purchaser of a business should have a targeted rate of return that justifies the substantial risks and costs of buying a business. That is true for both strategic and financial buyers.").

strategic buyer is interested in buying, it does not suggest a higher value, but a lower one.[260]

The record shows, furthermore, that the mere presence in the sales process of IHS, as a strategic bidder that was one of Solera's key competitors, incentivized the financial sponsors to put forth more competitive bids.[261]

The record also reflects that the Company provided all seriously interested bidders access to deeper, non-public information after they signed non-disclosure agreements. Although the Special Committee initially excluded IHS from the process due to competitive concerns and doubts about its ability to finance a deal,[262] once news of the sales process leaked out, the Special Committee worked promptly to accommodate IHS. After IHS contacted Centerview on August 21, 2015 to express interest,[263] representatives of Solera and IHS held a management meeting by August 26,[264] and Solera provided IHS with the Hybrid Case Projections by August

---

[260] 177 A.3d at 29 (citing *DFC*, 172 A.3d at 375 n.154 ("[T]he absence of synergistic buyers for a company is itself relevant to its value.")).

[261] *See* Tr. 973-74 (Sowul) ("And so that party, that IHS, that strategic, could, in theory, pay a lot more than we could. And we knew they were interested. . . . So we would have to pay as little as we can to maximize our returns but pay as much as we can so that we can be competitive against a strategic."); *see also PetSmart*, 2017 WL 2303599, at *29 (citation omitted) ("Importantly, the evidence reveals that the private equity bidders did not know who they were bidding against and whether or not they were competing with strategic bidders. They had every incentive to put their best offer on the table.").

[262] Tr. 780-82 (Yarbrough).

[263] PTO ¶ 307.

[264] *Id.* ¶ 312.

27.[265]  And, after IHS's CEO failed to attend the management meeting on August 26, Aquila traveled separately to meet him.[266]  IHS ultimately declined to make a topping bid during the go-shop period, but it was not for lack of access to information.  Solera gave IHS nearly full access to the approximately 12,000-document data room,[267] and IHS specifically commented that it "was appreciative of . . . the fact that [Solera] had provided equal access to information in order for IHS to consider a bid."[268]

Finally, I am not persuaded by petitioners' argument that "[t]he sale of Solera took place against the backdrop of extraordinary market volatility," such that it "was not the product of a well-functioning market."[269]  According to petitioners, the court should not rely on the Merger price as evidence of fair value because there was macroeconomic volatility, "evidenced by the VIX spiking to an [sic] historic high [on August 24, 2015] and sharp declines in global equity markets,"[270] which constrained potential bidders' ability to finance and willingness to enter a deal.[271]  In

---

[265] *Id.* ¶ 313.

[266] *Id.* ¶ 312; Tr. 442-43 (Aquila).

[267] PTO ¶ 351; Tr. 811 (Yarbrough).

[268] PTO ¶ 354.

[269] Pet'rs' Post-Trial Opening Br. 28.

[270] *Id*. at 28-29.  VIX stands for the CBOE Volatility Index, which Buckberg described as "a measure of market expectations of near-term volatility conveyed by S&P 500 stock index option prices."  JX0895.0012 (Buckberg expert report).

[271] Pet'rs' Post-Trial Opening Br. 28-33.

52

support of this theory, petitioners called Dr. Elaine Buckberg as an expert on market volatility.[272]

Buckberg testified that "investors are less willing to proceed with investments in the face of substantial uncertainty and volatility," and that when investors "do decide to proceed with an investment in the face of such uncertainty, they would expect to be compensated for the additional risk with a lower price."[273]  In that vein, Yarbrough, the Chairman of the Special Committee, candidly acknowledged that market volatility impacted "the financing side, [it] was making it more difficult on the debt financing side, and I think it also trickled over into the equity piece, too."[274]

As an initial factual matter, it is questionable whether the level of market volatility during the sales process was as extraordinary as petitioners suggest.  On August 24, 2015, the VIX closed at 40.74.[275]  Although petitioners describe this as the VIX's "highest point since January 2009" and "a level exceeded only six times in the VIX's twenty-seven year history,"[276] that assertion appears to be an exaggeration.  As Hubbard testified, the August 24 closing VIX has been exceeded

---

[272] Tr. 250 (Buckberg).

[273] *Id.* at 253 (Buckberg).

[274] *Id.* at 852 (Yarbrough).

[275] JX0895.0026.

[276] Pet'rs' Post-Trial Opening Br. 15.

on 157 days in the VIX's history.[277]  The August 24 spike also was relatively short-lived.  By August 28, just four days after closing at 40.74, the VIX had fallen back to "about 26," and had fallen further by September 11, the last trading day before the Special Committee accepted Vista's $55.85 bid.[278]  Including the spike on August 24, the "average VIX was 19.4 in August 2015 and 24.4 in September, as compared to an average of 19.7 since 1990."[279]

Even accepting that market volatility impacted the sales process by increasing financing costs and decreasing the price that financial sponsors were willing to pay, petitioners' argument is unavailing in my opinion for two reasons.  First, Buckberg made no attempt to quantify the impact of volatility on the Merger price.[280]  Second, and more importantly, petitioners' position ignores that they are only entitled to the fair value of Solera's stock at the time of the Merger, not to the best price theoretically attainable had market conditions been the most seller-friendly.[281]  As the Supreme Court pointedly explained in *DFC*:

---

[277] Tr. 1042-43 (Hubbard).

[278] *Id*. at 337-38 (Buckberg).

[279] JX0899.0027.

[280] *See* Tr. 295-96 (Buckberg); *see also DFC*, 172 A.3d at 350 ("[T]he fact that a financial buyer may demand a certain rate of return on its investment in exchange for undertaking the risk of an acquisition does not mean that the price it is willing to pay is not a meaningful indication of fair value.").

[281] *DFC*, 172 A.3d at 370.

Capitalism is rough and ready, and the purpose of an appraisal is not to make sure that the petitioners get the highest conceivable value that might have been procured had every domino fallen out of the company's way; rather, it is to make sure that they receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction.[282]

The record demonstrates that the Merger price "resulted from an open process, informed by robust public information, and easy access to deeper, non-public information, in which many parties with an incentive to make a profit had a chance to bid."[283] Thus, consistent with our high court's recent teachings, economic principles suggest that the Merger price is what petitioners "deserve to receive" for their shares.

### b. A Fully-Empowered Special Committee Actively Negotiated the Merger

Reliance on the deal price as evidence of fair value is strengthened when independent representatives of a target company actively negotiate with potential buyers and demonstrate a real willingness to reject inadequate bids.[284] Here, the record indicates that Solera's Special Committee was both competent and effective.

---

[282] *Id.* at 370-71.

[283] *Id.* at 349.

[284] *See Dell*, 177 A.3d at 28 ("The Committee, composed of independent, experienced directors and armed with the power to say 'no,' persuaded [the bidder] to raise its bid six times. Nothing in the record suggests that increased competition would have produced a better result."); *PetSmart*, 2017 WL 2303599, at *30 ("Had the auction not generated an offer that the Board deemed too good to pass up, I am satisfied that the Board was ready to pursue other initiatives as a standalone company."); *Lender Processing*, 2016 WL

On July 20, 2015, the day after receiving an indication of interest from Thoma Bravo, the Board delegated to the Special Committee the "full power and authority of the Board" to review, evaluate, negotiate, recommend, or reject any proposed transaction or strategic alternative.[285] The authorizing resolution further provided that Solera could not do a deal without the Special Committee's approval.[286] All three directors on the Special Committee were independent and experienced.[287] Yarbrough, the Chairman of the Special Committee, testified knowledgeably and forthrightly at trial about the process undertaken by the Special Committee, which was aided by reputable legal and financial advisors.[288] Petitioners tellingly make no effort to impugn the motives of any of the members of the Special Committee.

The record also demonstrates that the Special Committee actively engaged with the bidders, did not favor any one in particular, and expressed a willingness to walk away from bids that it did not find satisfactory. The Special Committee *twice* rejected bids that it considered inadequate—Vista's bid at $53 per share[289] and

---

7324170, at *19 ("Reinforcing the threat of competition from other parties was the realistic possibility that the Company would reject the [] bid and pursue a different alternative.").

[285] JX0359.0002.

[286] *Id.*

[287] Tr. 754-56, 771-72 (Yarbrough).

[288] *Id.* at 776-78 (Yarbrough).

[289] PTO ¶ 334.

Thoma Bravo's bid at $54 per share[290]—each time without the safety net of another offer.[291] The Special Committee's initial decision to defer inviting IHS into the sales process was reasonable, given its concerns about protecting Solera's competitively sensitive information and about IHS's ability to finance a transaction.[292] In any event, that decision became academic after news of the sales process leaked in the press, at which point the Company promptly engaged with IHS for over two weeks before signing a deal with Vista. Critically, as a condition of that deal, the Special Committee extracted the right to conduct a go-shop and for a reduced 1% termination fee for IHS (as opposed to 3% for other bidders) to facilitate continued discussions with IHS.[293] And, for reasons explained below, the negotiations with all bidders were not skewed by an artificially low stock price, since the market for Solera's stock before the Merger appears to have been efficient.[294]

---

[290] *Id.* ¶ 338.

[291] Tr. 806-07 (Yarbrough).

[292] *See PetSmart*, 2017 WL 2303599, at *28 (emphasis in original) ("I note that the Board considered inviting the most likely strategic partner . . . into the process, but made the reasoned decision that, without a firm indication of interest from [the competitor], the risks of providing [the company's] most direct competitor with unfettered access to [the company's] well-stocked data room outweighed any potential reward. Nevertheless, the evidence revealed that the Board held the door open for [the competitor] to join the auction *if* it expressed serious interest in making a bid.").

[293] PTO ¶¶ 325, 339, 350.

[294] *See infra* Section III.D.1.c.

Finally, the evidence shows that the Special Committee made a thoughtful, reasoned decision to accept Vista's "last and final" offer at $55.85 after countering with $56 and being rejected.[295] Before the Special Committee did so, Centerview counseled the Special Committee that "[i]t is uncertain whether extending the process will result in higher and fully financed offers, or will lead to further deterioration in Vista's bid" and that the "Vista bid can act as a pricing floor while IHS is given a further opportunity to bid at a reduced termination fee pursuant to the go-shop negotiated by the Committee."[296] As Yarbrough testified, with that advice in mind, the Special Committee unanimously decided to accept Vista's offer after comparing it to the Company's stand-alone prospects:

> We then asked for Centerview to go through a presentation analysis of [Vista's bid], with the preliminary steps to their fairness opinion. And then we ultimately had a vote on it, discussed stand-alone, decided that we preferred the 55.85 and moving forward with an all-cash, riskless deal. And so we had a unanimous vote on the special committee, and then we had a board meeting shortly thereafter where Centerview again presented to the board. We made our recommendation to the board and then the board unanimously accepted the recommendation.[297]

In response to this evidence, petitioners advance essentially two arguments challenging the integrity and quality of the sales process. I address each in turn.

---

[295] Tr. 807-08 (Yarbrough).

[296] JX0633.0013.

[297] Tr. 807-08 (Yarbrough).

Petitioners' primary challenge is that Aquila's conflicts of interest tainted the sales process through meetings he (with Baron's assistance) held with private equity firms before, and on one notable occasion after, the Special Committee was formed. Although Solera's Board could have done a better job of monitoring Aquila and his interactions with potential buyers, particularly after the Special Committee was in place, those interactions did not compromise the integrity or effectiveness of the sales process in my opinion.

The reality is that Aquila's participation in a transaction was a prerequisite for a financial sponsor to do a deal. As petitioners put it, "Aquila *is* Solera."[298] Consistent with that reality, all of the private equity firms that later submitted bids made clear that those bids depended on Aquila continuing to lead the Company.[299] In other words, a go-private transaction never would have been a possibility without buyers becoming personally acquainted and comfortable with Aquila. Thus, Aquila engaging in one-on-one conversations with private equity firms before the Special Committee was formed had the utility of gauging interest in the Company to see if

[298] Pet'rs' Post-Trial Opening Br. 4 (emphasis in original).

[299] JX0340.0003 ("We are contemplating this deal solely in the context of being able to partner with Tony Aquila and his management team.") (Thoma Bravo); JX0464.0005 ("We have been impressed by the high caliber of the management team we have met, and look forward to forming a successful and productive partnership with them and the other members of the Solera management team.") (Vista); JX0464.0008 ("Our team is ecstatic about the opportunity to partner with Tony and other members of senior management.") (Pamplona).

undertaking a formal sales process made sense. Critically, there is no indication in the record that any of those contacts predetermined or undermined the process when the Special Committee took charge.

That said, once the Company had received an indication of interest and put the Special Committee in place, the Special Committee should have monitored Aquila's contacts with potential bidders more carefully. Petitioners justifiably criticize Aquila's private two-hour meeting with Vista in August, shortly after which Vista began to model a larger option pool for post-Merger Solera executives.[300] Although Aquila and Sowul (a principal at Vista) both testified that compensation was not discussed during that meeting or at any time before the deal with Vista was signed[301]—and there is no direct evidence that it was—the timing is certainly suspicious and casts doubt on whether Aquila abided by the "Rules of the Road" advice the Special Committee's counsel provided, *i.e.*, to refrain from discussing post-Merger employment and compensation during the sales process.[302] If best practices had been followed, a representative of the Special Committee would have accompanied Aquila to the August meeting with Vista as a precaution.[303]

[300] JX0525; JX0541.

[301] Tr. 452 (Aquila), 971-73 (Sowul).

[302] Tr. 782-83 (Yarbrough); JX0380.0003-05.

[303] *See In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 117 (Del. Ch. 2007) (Strine, V.C.) ("I believe it would have been preferable for the Special Committee to have had its chairman or, at the very least, its banker participate with [the CEO] in negotiations with

Even if it is assumed that compensation discussions did occur during this meeting, nothing in the record indicates that any of Aquila's (or Baron's) actions before or during the sales process compromised or undermined the Special Committee's ability to negotiate a deal.[304] The record is devoid of any evidence, for example, that Aquila participated in price discussions with any of the bidders or influenced the outcome of a competitive sales process. Indeed, petitioners do not contend that Aquila ever discussed price with the Special Committee or any bidder, nor do they contend that he played any role in the deliberations or decision-making process of the Special Committee more generally.

Further, the record does not show that structural issues inhibited the effectiveness of the go-shop.[305] To the contrary, IHS indicated that it appreciated that the Company was transparent and facilitated its diligence. There also was a lower termination fee if IHS submitted a topping bid. In short, IHS had a realistic pathway to success,[306] but it ultimately decided not to submit a topping bid.

---

[the buyer]. By that means, there would be more assurance that [the CEO] would take a tough line and avoid inappropriate discussions that would taint the process.").

[304] I view Baron's statement in an email to his colleagues at Rothschild that "we were the architects with the CEO from the beginning as to how to engineer the process from start to finish" to be puffery. The email completely ignores Centerview's role in the sales process, and Baron's statement that he is "excited to . . . market the heck out of this for future business" betrays his motivation for exaggerating his involvement in the transaction. Notably, three recipients of Baron's email were his superiors at Rothschild. JX0670.0002.

[305] *Dell*, 177 A.3d at 31-32.

[306] *Id.*

As a secondary matter, petitioners advance a one-paragraph argument that the Merger was a *de facto* MBO (management buyout) because the Special Committee "knew" that if Solera was to be sold, it was going to be sold to a private equity firm, and all the private equity firms made clear that they "only wanted Solera if Aquila was part of the deal."[307] Petitioners thus contend that the Merger warrants "heightened scrutiny."[308] This argument fails for essentially two reasons.

First, contrary to petitioners' characterization of the transaction, the Merger did not have the requisite characteristics of an MBO. Petitioners' own expert (Cornell) agreed that the common definition of an MBO is a transaction "where, when it was negotiated, senior management was a participant in the transaction as an acquirer," but then conceded that the Merger was not an MBO because "it was not a joint purchase between management and another party."[309] During the sales process, Aquila did not have an agreement with Vista or any other bidder to participate as a buyer in a particular transaction.[310] To the contrary, he expressed a willingness to invest $15 million in a transaction with *any* of the potential buyers,

---

[307] Pet'rs' Post-Trial Opening Br. 26.

[308] *Id.* at 27.

[309] JX0902.0005; *see also* Tr. 148-49 (Cornell).

[310] JX0899.0011.

not just Vista.[311] Further, Aquila was a not an "acquirer" in the Merger[312] because, before the transaction, Aquila's holdings at the $55.85 per share were worth approximately $55 million,[313] and after the Merger, Aquila invested $45 million into the post-Merger company.[314] In short, as Cornell admitted, the Merger was not even "similar to an MBO."[315]

Second, petitioners contend that MBOs should be subject to "heightened scrutiny" but fail to explain why. As the Supreme Court stated in *Dell*, even though there may be "theoretical characteristics" of an MBO that could "detract[] from the reliability of the deal price,"[316] the deal price that results from an MBO is not inherently suspect or unreliable *per se*.[317] Here, to repeat, the Special Committee had the full authority to control the sales process, and exercised that authority by deciding which bidders to contact, how to respond to bids, and ultimately whether to approve the Merger.

---

[311] Tr. 589 (Aquila).

[312] Tr. 1034 (Hubbard) ("Q. Was Mr. Aquila a net buyer in this transaction? A. Not the way economists would use that term, no. Q. And how do you understand that term? A. Actually, the economic definition is pretty much as the plain English. It would mean contributing new cash as a net buyer. That did not happen.").

[313] JX0899.0009.

[314] PTO ¶¶ 382-387.

[315] Tr. 148-49 (Cornell).

[316] *Dell*, 177 A.3d at 31.

[317] *See id.* at 6 (noting that the features of an MBO transaction that may render the deal price unreliable "were largely absent" in the Dell MBO).

## c. The Equity and Debt Markets Corroborate that the Best Evidence of Solera's Fair Value was the Merger Price

In *DFC,* the Supreme Court endorsed the economic proposition that the "price at which [a company's] shares trade is informative of fair value" in an appraisal action when "the company had no conflicts related to the transaction, a deep base of public shareholders, and highly active trading," because "that value reflects the judgments of many stockholders about the company's future prospects, based on public filings, industry information, and research conducted by equity analysts."[318] The Court in *Dell* reiterated the same point, explaining that in an efficient market "a mass of investors quickly digests all publicly available information about a company, and in trading the company's stock, recalibrates its price to reflect the market's adjusted, consensus valuation of the company."[319] My inference from *DFC* and *Dell* is that the Supreme Court has emphasized this point because the price

---

[318] *DFC*, 172 A.3d at 373.

[319] *Dell*, 177 A.3d at 25 (citation omitted); *see also* JX0894.0034 (Hubbard expert report) ("In a well-functioning stock market, a company's market price quickly reflects publicly available information. A market price balances investors' willingness to buy and sell the shares in light of this information, and thus represents their consensus view as to the value of the equity of the company. As a result, finance academics view market prices as an important indicator of intrinsic value absent evidence of frictions that impede market efficiency.").

of a widely dispersed stock traded in an efficient market may provide an informative

lower bound in negotiations between parties in a potential sale of control.[320]

Here, the record supports the conclusion that the market for Solera's stock

was efficient and well-functioning, since: (i) Solera's market capitalization of about

$3.5 billion placed it in the middle of firms in the S&P MidCap 400 index;[321] (ii) the

stock was actively traded on the New York Stock Exchange, as indicated by weekly

trading volume of 4% of shares outstanding;[322] (iii) the stock had a relative bid-ask

spread of approximately 0.06%, in line with a number of S&P MidCap 400 and S&P

500 companies;[323] (iv) the Company's short interest ratio indicated that, on average,

investors who had sold the stock short would be able to cover their positions in about

two days, which was faster than about three-quarters of S&P 400 MidCap companies

and about half of S&P 500 companies;[324] (v) at least eleven equity analysts covered

---

[320] *See Dell*, 177 A.3d at 27 n.131 ("This is evident as the court observed that the stock price anchors negotiations and, if the stock price is low, the deal price necessarily might be low.").

[321] JX0894.0035. The S&P MidCap 400 contains 400 firms that are generally smaller than those in the S&P 500 but "capture a period in the typical enterprise life cycle in which firms have successfully navigated the challenges inherent to small companies, such as raising initial capital and managing early growth." *Mid Cap: A Sweet Spot for Performance*, S&P Dow Jones Indices 1 (September 2015), https://us.spindices.com/documents/education/practice-essentials-mid-cap-a-sweet-spot-for-performance.pdf.

[322] JX0894.0035, 137.

[323] *Id.*

[324] *Id.*

Solera during the year before the Merger; [325] and (vi) Solera's stock price moved sharply as rumor of the sales process leaked into the market.[326]

The proxy statement for the Merger identified August 3, 2015 as the unaffected date for purposes of calculating a premium.[327] As of that date, a well-informed, liquid trading market determined, before news of a potential transaction leaked into the market, that the Company's stock was worth $36.39.[328] Significantly, research analysts' price targets had been declining in the months before news of a potential transaction, and these targets remained *below* the deal price through announcement of the Merger.[329] As Hubbard put it, the takeaway from these two objective indications of value is that "market participants playing with real money, looking at the information that they have, don't think that the stock is worth $55.85 during that period."[330]

---

[325] JX0894.0035.

[326] *See* JX0842-43 (observing that Solera's stock rose more than ten percent on multiple times its normal daily trading volume on August 4 and 5, 2015, and concluding that "this trading activity is consistent with trading on rumors of a transaction").

[327] PTO ¶ 363.

[328] *Id.* ¶ 364 & Ex. A.

[329] Tr. 1052-53 (Hubbard); JX0894.0047-48.

[330] Tr. 1053 (Hubbard). *See also DFC*, 172 A.3d at 369 (quoting *Applebaum v. Avaya, Inc.*, 812 A.2d 880, 889-90 (Del. 2002)) ("[A] well-informed, liquid trading market will provide a measure of fair value superior to any estimate the court could impose.").

Despite these market realities, petitioners contend that Solera was worth $84.65 per share—more than double its unaffected stock price of $36.39 per share as of August 3.[331] Although one would expect a control block to trade at a higher price than a minority block,[332] petitioners are unable to explain such a gaping disconnect between Solera's unaffected market price and the Merger price.

Petitioners argue that the pre-Merger stock price was artificially low because the market for Solera was not efficient due to asymmetric information. More specifically, petitioners contend that Solera was "poised to 'harvest returns'"[333] from acquisitions it made between 2012 and 2015, but management struggled to disclose sufficient information, due to competitive concerns, to allow the market to value the Company properly.[334] This argument ignores evidence that many equity investors and analysts actually *did* understand Solera's long-term plans, with some approving of management's strategy but others not buying the story.[335] Consider the following

---

[331] Pet'rs' Post-Trial Opening Br. 4.

[332] *See, e.g.*, *DFC*, 172 A.3d at 369 n.117 ("One of the reasons, of course, why a control block trades at a different price than a minority block is because a controller can determine key issues like dividend policy."); *IRA Tr. v. Crane*, 2017 WL 7053964, at *7 n.54 (Del. Ch. Dec. 11, 2017) ("That control of a corporation has value is well-accepted.").

[333] Pet'rs' Post-Trial Opening Br. 6.

[334] *See, e.g.*, PTO ¶¶ 243-44.

[335] *Dell*, 177 A.3d at 26-27; *see also id.* at 24 ("[A]nalysts scrutinized [the company's] long-range outlook when evaluating the Company and setting price targets, and the market was capable of accounting for [the company's] recent mergers and acquisitions and their prospects in its valuation of the Company.").

varied perspectives that analysts (and one of the petitioners) expressed within just a

few months before news of the sales process leaked to the press:

| Positive | Negative |
|---|---|
| "After years of M&A, [Solera] is confident the various pieces it has been putting together are finally starting to make more sense. More financial disclosures (started); a renewed IR push and new branding efforts . . . are all efforts to help investors better understand Tony's vision." (Barclays, April 13, 2015)[336]<br><br>"While we acknowledge some shareholder angst over share price performance relative to the market and the group, we believe there is inherent franchise value in this collection of assets and businesses. Tony Aquila, Solera's CEO, should be instrumental in optimizing its competitive position and generating shareholder value. As a result, [Solera] remains an attractive risk/reward, in our view, for patient investors whose risk profile can tolerate elevated financial leverage." (SunTrust Robinson Humphrey, July 17, 2015)[337]<br><br>"We appreciate Solera's strategy of moving into tangential markets that align with the company's core business while still providing diversification away from auto claims. Recent acquisitions and investments show progress on | "Solera's story remains more complicated than most investors would like, we see more downside risk to estimates in the short term, and there are some valid concerns and criticisms of the story presently." (William Blair, July 13, 2015)[339]<br><br>"Since hitting a peak equity value in early calendar year 2014 at $4.8 billion, the negative effect of sub-par returns from acquisitions, increased leverage and growth in interest expense has reduced shareholder value by over $2.2 billion to $2.6 billion. . . . A frequent complaint from investors regarding a potential investment in [Solera] is a lack of confidence in both management and the Board of Directors." (Barrington Research, July 20, 2015)[340]<br><br>"With significantly higher leverage, down earnings over the next 12 months, and recent inconsistent performance, we are stepping to the sidelines until we get increased clarity into either accelerating revenue growth or a return to sustainable earnings growth." (Piper Jaffray, July 20, 2015)[341] |

---

[336] JX0202.0001.

[337] JX0328.0001.

[339] JX0312.0002.

[340] JX0348.0002.

[341] JX0344.0002.

| Positive | Negative |
|---|---|
| management's long-term strategy to capture more of a household's auto and insurance related decisions by leveraging [Solera's] existing assets into attractive adjacencies and horizontal products." (J.P. Morgan, July 21, 2015)[338] | The Fir Tree petitioners "decide[d] to throw in the towel on [Solera]" and sold their shares in mid-2015 because, in part, the Company was "taking margins down," "will pay anything for an asset they like," and leverage reached "5.5x-6x" after its most recent acquisition. (Fir Tree email to Bloomberg, July 15, 2015)[342] |

These reviews suggest that there was disagreement in the financial community over Solera's strategy, not that the market as a whole did not understand it. Given the many factors indicating that the market for the Company's stock was efficient, the market presumably would have digested all of these sentiments and incorporated them into Solera's stock price. Yet Solera's pre-Merger unaffected stock price as of August 3 was still only $36.39.

The debt market further corroborates that, given its operative reality, Solera was not as valuable as petitioners contend. Petitioners do not dispute that the debt market had run dry for Solera as a public company as of the Merger. With its leverage already rising, the Company made an acquisition in November 2014, financing the deal with a $400 million notes offering.[343] Moody's promptly downgraded the Company's credit rating from Ba2 to Ba3.[344] In July 2015, after

---

[338] JX0350.0002.

[342] JX0319.0001.

[343] Tr. 393-96 (Aquila).

[344] JX0140.0003.

Solera issued $850 million of senior unsecured notes to finance another acquisition and retire outstanding debt, Moody's downgraded Solera again, from Ba3 to B1.[345] Further exemplifying Solera's challenges in taking on additional debt to finance acquisitions, the July 2015 debt offering fell short, and Goldman Sachs had to absorb $11.5 million of notes that it was unable to syndicate into the market.[346]

By July 2015, "despite the lucrative fees that investment bankers make from refinancing a large tranche of public company debt and syndicating a new issue,"[347] Solera had run "out of runway" in the debt market.[348] "In other words, participants in the public bond markets weren't convinced they would get their money back if they gave it to [Solera], and [Solera] was not offering enough interest to compensate investors for the risk they saw in the company."[349] Petitioners' own expert admitted that the acquisition debt market for Solera was tight at equity values greater than the Merger price.[350] In short, the debt market, like many equity market participants,

---

[345] JX0310.0004.

[346] Tr. 413-14 (Aquila); JX0318.0001.

[347] *DFC*, 172 A.3d at 355.

[348] Tr. 399-401 (Aquila).

[349] *DFC*, 172 A.3d at 374.

[350] *See* Tr. 114 (Cornell) ("[I]n this market condition, for whatever reason, there wasn't a lot of cheap debt available, and that limited what a private equity firm's going to be able to pay and satisfy itself and its shareholders."); *see also DFC*, 172 A.3d at 375 ("As is the case with refinancings, so too do banks like to lend and syndicate the acquisition debt for an M&A transaction if they can get it done. That is how they make big profits. That lenders would not finance a buyout of DFC at a higher valuation logically signals weakness in its future prospects, not that debt providers and equity buyers were all mistaken. So did

viewed Solera skeptically and perceived its growth-by-acquisition strategy as laden with risk.[351]

\* \* \* \* \*

To summarize, the Merger was the product of a two-month outreach to large private equity firms in May and June, a six-week auction by an independent Special Committee that solicited eleven private equity and seven strategic firms, and public announcements that put a "For Sale" sign on the Company. The Special Committee had competent advisors and the power to say no to an underpriced bid, which it did twice. The Merger price of $55.85 proved to be a market-clearing price through a 28-day go-shop and a three-month window-shop. No one was willing to pay more. Thus, as this court once put it, the "logical explanation . . . is self-evident": Solera "was not worth more" than $55.85 per share.[352]

---

the fact that DFC's already non-investment grade debt suffered a downgrade in 2013 and then was put on a negative credit watch in 2014.").

[351] *See DFC*, 172 A.3d at 349 ("Like any factor relevant to a company's future performance, the market's collective judgment of the effect of . . . risk may turn out to be wrong, but established corporate finance theories suggest that the collective judgment of the many is more likely to be accurate than any individual's guess. When the collective judgment involved, as it did here, not just the views of the company stockholders, but also those of potential buyers of the entire company and those of the company's debtholders with a self-interest in evaluating the regulatory risks facing the company, there is more, not less, reason to give weight to the market's view of an important factor.").

[352] *Highfields Capital. Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 60 (Del. Ch. 2007).

### 2. Merger Fees Should not be Added to the Deal Price

Petitioners argue that, "if deal price is an indicator of fair value," the court should add nearly $450 million—or $6.51 per share—to the Merger price. According to petitioners, this is the amount of transaction costs Vista incurred in connection with the Merger for buyer fees and expenses, seller fees, debt fees, and an "early participation premium" to retire debt in connection with the transaction.[353] Petitioners offer no precedent or other legal support for this request. They simply contend that these costs should be added because the court's "focus should be on what Vista was actually willing to spend to buy the Company."[354] This argument fails for two independent reasons.

First, petitioners' argument cannot be squared with the definition of "fair value" in the appraisal context that our Supreme Court recently articulated in *DFC* when explaining the purpose of appraisal:

> [F]air value is just that, "fair." It does not mean the highest possible price that a company might have sold for had Warren Buffet negotiated for it on his best day and the Lenape who sold Manhattan on their worst. . . . *[T]he purpose of appraisal* is not to make sure that the petitioners get the highest conceivable value that might have been procured had every domino fallen out of the company's way; rather, it *is to make sure that they receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction*.[355]

---

[353] Pet'rs' Post-Trial Opening Br. 34-35.

[354] *Id*. at 35.

[355] *DFC*, 172 A.3d at 370-71 (emphasis added).

The Merger price was the result of arm's-length bargaining between the Special Committee and Vista. Perhaps Vista would have been willing to pay more than $55.85 for the Company, but that is irrelevant to the court's independent determination of *fair* value as that term was explained in *DFC*.[356]

Second, policy concerns counsel against adding transaction fees to the deal price in determining Solera's fair value. If stockholders received payment for transaction fees in appraisal proceedings, then it would compel rational stockholders in even the most pristine deal processes to seek appraisal to capture their share of the transaction costs (plus interest) that otherwise would be unavailable to them in any non-litigated arm's-length merger. This incentive would undermine the underlying purpose of appraisal proceedings as explained in *DFC*.

### 3. Deduction for Merger Synergies

The appraisal statute provides that "the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger."[357] Thus, the "appraisal award excludes synergies in

---

[356] The Supreme Court also made clear that a deal price arrived at by using an LBO model can be the most reliable evidence of fair value of a target company. *See DFC*, 172 A.3d at 350 ("[T]he fact that a financial buyer may demand a certain rate of return on its investment in exchange for undertaking the risk of an acquisition does not mean that the price it is willing to pay is not a meaningful indication of fair value.").

[357] 8 *Del. C.* §262(h).

accordance with the mandate of Delaware jurisprudence that the subject company in an appraisal proceeding be valued as a going concern."[358]

Synergies do not only arise in the strategic-buyer context. It is recognized that synergies may exist when a financial sponsor is an acquirer.[359] As of trial, Vista owned 40 software businesses, three of which (EagleView, Omnitracs, and DealerSocket) Vista believed had significant "touch points" with Solera from which synergies could be realized.[360]

Vista modeled out four different categories of synergies in its financial analysis of the Company during the bidding process.[361] Respondent's expert presented evidence at trial concerning three of those categories: portfolio company revenue synergies, private company cost savings, and the tax benefits of incremental leverage.[362] In total, he calculated total expected synergies of $6.12 per share.[363] From there, respondent's expert made a "conservative" estimate that 31% of the

---

[358] *Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.*, 847 A.2d, 340, 343 (Del. Ch. 2004) (Strine, V.C).

[359] *See, e.g.*, *PetSmart*, 2017 WL 2303599, at *31 n.364 (citation omitted) (noting "synergies financial buyers may have with target firms arising from other companies in their portfolio"); *Lender Processing*, 2016 WL 7324170, at *17 n.14 (noting that "a source of private value" to a financial buyer is "a synergistic portfolio company").

[360] Tr. 908-16 (Sowul); JX0613.0033.

[361] *Id.* at 908-09 (Sowul).

[362] *Id.* at 1045-48 (Hubbard); JX0894.0066-71.

[363] *Id.* at 1045-46 (Hubbard); JX0894.0070-71.

value of the synergies—equating to $1.90 per share—remained with the seller by using the lowest percentage identified in one of three empirical studies.[364]

I find this evidence, which petitioners made no effort to rebut, convincing.[365] Deducting $1.90 from the Merger price of $55.85 leads to a value of $53.95 per share. For all the reasons discussed above, and based on my lack of confidence in the DCF models advanced by the parties (as discussed next), I conclude that this amount ($53.95 per share) is the best evidence of the fair value of petitioners' shares of Solera at the time of the Merger.

### 4.    The Dueling Discounted Cash Flow Models

Consistent with the court's duty to consider "all relevant factors" in determining Solera's fair value,[366] I consider next the DCF models the parties'

---

[364] Tr. 1047-48 (Hubbard); JX0894.0070-71. This 31% figure is the "median portion of synergies shared with the seller" as determined by a 2013 Boston Consulting Group study of 365 deals. JX0894.0070-71. Although the appraisal statute mandates excision of synergies specific to the merger at issue, this court has used general estimates of the percentage of synergies shared, as provided by experts, to derive appraisal value from deal price. *See Union Ill.*, 847 A.2d at 353 & n.26 (relying on a "reasonable synergy discount" propounded by a party's expert).

[365] *See DFC*, 172 A.3d at 371 ("Part of why the synergy excision issue can be important is that it is widely assumed that the sales price in many M&A deals includes a portion of the buyer's expected synergy gains, which is part of the premium the winning buyer must pay to prevail and obtain control.").

[366] *See* 8 *Del. C.* § 262(h) ("In determining such fair value, the Court shall take into account all relevant factors."); *DFC*, 172 A.3d at 388 ("But, in keeping with our refusal to establish a 'presumption' in favor of the deal price because of the statute's broad mandate, we also conclude that the Court of Chancery must exercise its considerable discretion while also explaining, with reference to the economic facts before it and corporate finance principles, why it is according a certain weight to a certain indicator of value.").

experts prepared. Compared with a market-generated transaction price, "the use of alternative valuation techniques like a DCF analysis is necessarily a second-best method to derive value."[367]

In this action, both parties' experts created "three-stage" DCF models consisting of (i) the five-year Hybrid Case Projections (fiscal years 2016 through 2020), (ii) a five-year transition period (fiscal years 2021 through 2025), and (iii) a terminal period beginning in fiscal year 2026.[368] The outcome of these models nonetheless resulted in widely divergent DCF valuations—$84.65 per share for petitioners, and $53.15 per share for respondent.

As a preliminary matter, I find comfort that respondent's DCF analysis is in the same ballpark as the deal price less estimated synergies.[369] On the other side of the ledger, given my conclusions about the quality of the sales process for Solera, petitioners' DCF analysis strikes me as facially unbelievable as it suggests that, in a transaction with an equity value of approximately $3.85 billion at the deal price,[370] potential buyers left almost $2 billion on the table by not outbidding Vista. Our

---

[367] *Union Ill.*, 847 A.2d at 359.

[368] JX0894.0075 (Hubbard); JX0898.0098, 0124 (Cornell).

[369] *See S. Muio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007, at *20 (Del. Ch. Mar. 9, 2011) (quoting *Hanover Direct, Inc. S'holders Litig.*, 2010 WL 3959399, at *2-3 (Del. Ch. Sept. 24, 2010)) (noting that the court "gives more credit and weight to experts who apply 'multiple valuation techniques that support one another's conclusions' and that 'serve to cross-check one another's results.'"), *aff'd*, 35 A.3d 419 (Del. 2011).

[370] JX0835.

Supreme Court has acknowledged that a DCF that results in a valuation so substantially below the transaction price may indeed lack "credibility on its face."[371]

"Delaware courts must remain mindful that 'the DCF method is [] subject to manipulation and guesswork [and that] the valuation results that it generates in the setting of a litigation [can be] volatile."[372] "[E]ven slight differences in [a DCF's] inputs can produce large valuation gaps."[373] A number of factors explain the gaping difference between petitioners' and respondent's DCF analyses, and, notably, many of these disagreements relate to how to value Solera into perpetuity. Such assumptions about Solera's business in the terminal period, *i.e.*, *ten-plus years into the future*, are unavoidably tinged with a heavy dose of speculation.

---

[371] *See Dell*, 177 A.3d at 36 (citations omitted) ("As is common in appraisal proceedings, each party—petitioners and the Company—enlisted highly paid, well-credentialed experts to produce DCF valuations. But their valuation landed galaxies apart—diverging by approximately $28 billion, or 126%. . . . The Court of Chancery recognized that '[t]his is a recurring problem,' and even believed the 'market data is sufficient to exclude the possibility, advocated by the petitioners' expert, that the Merger undervalued the Company by $23 billion.' Thus, the trial court found petitioners' valuation lacks credibility on its face. We agree."); *PetSmart, Inc.*, 2017 WL 2303599, at *2 ("Moreover, the evidence does not reveal any confounding factors that would have caused the massive market failure, to the tune of $4.5 billion (a 45% discrepancy)."); *Highfields*, 939 A.2d at 52 (citation omitted) (disregarding analysis that was "markedly disparate from market price data for [the company's] stock and other independent indicia of value").

[372] *PetSmart*, 2017 WL 2303599, at *40 n.439 (quoting William T. Allen, *Securities Markets as Social Products: The Pretty Efficient Capital Market Hypothesis*, 28 J. CORP. L. 551, 560 (2003)).

[373] *Dell*, 177 A.3d at 38.

I highlight below some of the major areas of disagreement between the parties. This discussion is meant to be illustrative and not exhaustive. All of these disagreements predictably result in a higher asserted valuation by petitioners and a lower asserted valuation by respondent.

The most significant point of contention in the DCF models concerns the estimated amount of cash that Solera would need to reinvest over the terminal period.[374] This "plowback" rate is the percentage of after-tax operating profits that the Company would need to invest to grow at a specified rate into perpetuity.[375] Using the method identified in "many leading valuation texts including Damodaran (2012) and Koller, Goedhart and Wessels (2015)," which petitioners' expert has called the "traditional model,"[376] respondent argues that the required reinvestment rate is 37.1%.[377] Petitioners, on the other hand, argue that the inflation plowback formula published in articles written by Bradley and Jarrell should be used, resulting in a required reinvestment rate of only 16.4%.[378] According to petitioners, holding

---

[374] JX0899.0004.

[375] JX0899.0045.

[376] JX1419.0002, 0007.

[377] JX0894.0082; Tr. 1067-68, 1189 (Hubbard).

[378] JX0900.0027; Tr. 64-66, 77-81 (Cornell). Respondent not only argues that it is incorrect to apply Bradley/Jarrell, but that petitioners also misapplied the formula. Specifically, respondent argues that petitioners erred by applying their Bradley/Jarrell-derived investment rate to net operating profit after tax (NOPAT) instead of net cash flow (NCF). According to respondent, this mistake resulted in improperly assuming away Solera's

all else constant in respondent's DCF analysis, the difference between using these two reinvestment rates yields a huge $23.90 per share difference in Solera's valuation.[379]

Another notable area of disagreement in the DCF models is Solera's return on invested capital ("ROIC") in the terminal period. Respondent assumed, consistent with "a theory this court has repeatedly cited with approval,"[380] that in the long run the present value of Solera's growth opportunities would disappear due to increased competition, so the Company's ROIC would gradually converge with its weighted average costs of capital ("WACC").[381] Petitioners disagree with applying the convergence model to Solera. They contend that the Company possesses "moats" around its business, such as barriers to entry, competitive advantages, and market

---

required maintenance investment into perpetuity. Resp't's Post-Trial Opening Br. 47, 51-52.

[379] Tr. 103; JX0900.0007-08.

[380] *PetSmart*, 2017 WL 2303599, at *39; *see also In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2011 WL 227634, at *4 n.16 (Del. Ch. Jan. 14, 2011) (stating that the convergence model is "a reflection of the widely-accepted assumption that for companies in highly competitive industries with no competitive advantages, value-creating investment opportunities will be exhausted over a discrete forecast period, and beyond that point, any additional growth will be value-neutral," leading to "return on new investment in perpetuity [that] converge[s] to the company's cost of capital"); *Cede & Co. v. Technicolor, Inc.*, 1990 WL 161084, at *26 (Del. Ch. Oct. 19, 1990) (discussing that "profits above the cost of capital in an industry will attract competitors, who will over some time period drive returns down to the point at which returns equal the cost of capital"), *aff'd in part and rev'd in part on other grounds*, 634 A.2d 345 (Del. 1993).

[381] Tr. 1085-87 (Hubbard).

dominance, that will give it *perpetual* advantages over potential competitors.[382]

Petitioners thus argue that Solera will earn a return of 4.5% *above* its WACC in perpetuity during the terminal period.[383] When the court asked petitioner's expert how he landed on 4.5%, his response was candid: "It's a little bit of a finger in the wind."[384]

The parties also disagree about how to account for stock-based compensation ("SBC") in their DCF models, both for the discrete period and the terminal period. Respondent applied the "cash basis" method to stock-based compensation expense, using the cash amount that the Company would have to spend to account for SBC as a normalized percentage of revenue.[385] Petitioners did not independently calculate SBC and instead used the Company's projections.[386] These projections were calculated on a book basis, benchmarked to Solera's actual stock price, and assumed to grow at 5% annually.[387]

The parties also handled the contingent tax liability attached to Solera's foreign earnings very differently. As of the Merger, the Company had earned

---

[382] JX0900.0028, 32.

[383] JX0900.0031.

[384] Tr. 242-43 (Cornell).

[385] *Id*. at 1059-60 (Hubbard); JX0899.0043-44.

[386] *Id*. at 57 (Cornell).

[387] *Id*. at 1060 (Hubbard).

approximately $1.2 billion in foreign profits, for which it had only paid taxes where those profits were earned.[388] Solera historically designated these profits as permanently reinvested earnings ("PRE"). Before these earnings can be repatriated to the United States or paid to stockholders, the Company must pay the residual tax, *i.e.*, the marginal amount between the U.S. tax rate and the amount already paid internationally.[389] Respondent assumed that $350 million of foreign earnings that had been de-designated as PRE would be repatriated as of the Merger had there not been a deal, and that the rest of Solera's foreign profits, both past and future, would be repatriated on a rolling basis following a five-year deferral period.[390] This repatriation would cause Solera to pay more in taxes, decreasing the Company's value. Petitioners, by contrast, assumed that such taxes would *never* be paid because they contend the timing of repatriation is unknown and thus these tax liabilities are speculative.[391]

Finally, the parties disagreed about the amount of cash to be added back to Solera's enterprise value in order to convert it to equity value. This court has repeatedly held that only "excess cash" is to be added back.[392] Solera had

---

[388] *Id.* at 692-93 (Giger).

[389] *Id.* at 1094-97 (Hubbard).

[390] *Id.* at 1094-98 (Hubbard).

[391] *Id.* at 70-75 (Cornell); JX0900.0040-42.

[392] *See, e.g.*, *In re Appraisal of SWS Grp., Inc.*, 2017 WL 2334852, at *15 (Del. Ch. May 30, 2017) (citation omitted) ("It is true as a matter of valuation methodology that non-

approximately $480 million of cash at closing.[393]  During the sales process, the Company's CFO did a country-by-country analysis and determined that Solera needed $160 million to $165 million to fund its operations.[394]  Respondent used that analysis to deduct $165 million from the Company's $480 million of cash at closing and added back the difference, *i.e.*, $315 million.[395]  Petitioners, on the other hand, added back *all* of the $480 million, reasoning that "with modern computer technology, a good CFO doesn't need any wasting cash," and that "it would require an incompetent corporate treasurer for a big chunk of the cash balance to be wasting cash."[396]

* * * * *

There are other points of disagreement in the parties' DCF models, but it is not necessary to detail them here.  As explained above, the Merger price was the product of "an open process, informed by robust public information, and easy access to deeper, non-public information, in which many parties with an incentive to make a profit had a chance to bid."[397]  Given the huge gap between petitioners' DCF

---

operating assets—including cash in excess of that needed to fund the operations of the entity—are to be added to a DCF analysis.").

[393] Tr. 229 (Cornell).

[394] *Id.* at 695 (Giger).

[395] JX0894.0103; Tr. 1092-94 (Hubbard).

[396] Tr. 67-68 (Cornell).

[397] *DFC*, 172 A.3d at 349.

valuation and the Merger price, which I have found to be a reliable indicator of value in accordance with the teachings of *DFC* and *Dell*, I find petitioners' DCF valuation not to be credible on its face and accord it no weight.[398]

My decision to do so is corroborated by the fact that nearly **88%** of petitioners' enterprise valuation is attributable to periods *after* the five-year Hybrid Case Projections.[399] In other words, petitioners' DCF valuation is largely a prediction about the Company's operations many years into the future. Such predictions, even when informed, are unavoidably speculative, where small variances in a DCF's inputs can lead to wide valuation swings.[400]

I also give no weight to respondent's DCF valuation, but for a different reason. Although that valuation is close to my Merger price less synergies calculation, respondent's own expert opined that his DCF valuation is "less reliable" than the

---

[398] *See Dell*, 177 A.3d at 35 ("When . . . an appraisal is brought in cases like this where a robust sale process [involving willing buyers with thorough information and the time to make a bid] in fact occurred, the Court of Chancery should be chary about imposing the hazards that always come when a law-trained judge is forced to make a point estimate of fair value based on widely divergent partisan expert testimony."); *DFC*, 172 A.3d at 379 ("Simply given the Court of Chancery's own findings about the extensive market check, the value gap already reflected in the court's original discounted cash flow estimate of $13.07 should have given the Court doubts about the reliability of its discounted cash flow analysis.").

[399] JX0898.0124.

[400] *See Dell*, 177 A.3d at 37-38 ("Although widely considered the best tool for valuing companies when there is no credible market information and no market check, DFC valuations involve many inputs—all subject to disagreement by well-compensated and highly credentialed experts—and even slight differences in these inputs can produce large valuation gaps.").

Merger price minus synergies valuation "given the uncertainties . . . surrounding several inputs to the DCF valuation."[401]  I agree, and will accord the value of the Merger price minus synergies dispositive weight in this case.[402]

### 5. Respondent's Unaffected Stock Price Argument is Unavailing

In the wake of our Supreme Court's decisions in *DFC* and *Dell*, the Court of Chancery determined in *Aruba* that the fair value of petitioners' shares in an appraisal proceeding was the thirty-day average unaffected market price of the company's shares, *i.e.*, $17.13 per share.[403]  In reaching this conclusion, Vice Chancellor Laster declined to adopt his deal price ($24.67 per share) less synergies figure of $18.20 per share because of his concerns that this figure (i) "likely was tainted by human error," and (ii) "continues to incorporate an element of value derived from the merger itself:  the value that the acquirer creates by reducing agency costs."[404]

In its supplemental brief, respondent argues that, "in light of recent cases, the best evidence of Solera's fair value is its unaffected stock price of $36.39 per

---

[401] JX0894.0126.

[402] Given my conclusion to accord no weight to either side's DCF model, there is no need to retain a court-appointed expert to resolve the parties' disagreement concerning the appropriate method to determine the investment rate for the terminal period.

[403] *Aruba*, 2018 WL 922139, at *1, 4.

[404] *Id.* at *2-3.

share."[405]  This argument, which advocates for a fair value determination about 35% below the deal price, reflects a dramatic change of position that I find as facially incredible as petitioners' DCF model.  Before, during, and after trial (until *Aruba* was decided), respondent and its highly credentialed expert—a former chairman of the President's Council of Economic Advisors[406]—consistently asserted that the "market-generated Merger price, adjusted for synergies" of $53.95 per share is the "***best evidence*** of Solera's value" as of the date the Merger.[407]   For the reasons explained above, the court independently has come to the same conclusion.

Notably, nothing prevented respondent from advancing at trial the "unaffected market price" argument the *Aruba* court embraced.  The scholarship underpinning the notion that *both* synergies and agency costs are elements of value derived from a merger that should be excluded under Section 262(h) has been in the public domain for many years and was readily available when this case was tried.[408]  Yet respondent

---

[405] Resp't's Suppl. Post-Trial Br. 5.

[406] Tr. 1023 (Hubbard).

[407] Resp't's Post-Trial Opening Br. 1 (emphasis added).

[408] *Aruba*, 2018 WL 922139, at *3 n.16 (citing William J. Carney & Mark Heimendinger, *Appraising the Nonexistent:  The Delaware Court's Struggle with Control Premiums*, 152 U. PA. L. REV. 845, 847–48, 857–58, 861–66 (2003); Lawrence A. Hamermesh & Michael L. Wachter, *Rationalizing Appraisal Standards in Compulsory Buyouts*, 50 B.C. L. REV. 1021, 1023–24, 1034–35, 1044, 1046–54, 1067 (2009); Lawrence A. Hamermesh & Michael L. Wachter, *The Short and Puzzling Life of the "Implicit Minority Discount" in Delaware Appraisal Law*, 156 U. PA. L. REV. 1, 30–36, 49, 52, 60 (2007); Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. CORP. L. 119, 128, 132–33, 139–42 (2005)).

made no effort to advance this theory at trial and, thus, petitioners were afforded no opportunity to respond to it. In this respect, I agree with the sentiment Vice Chancellor Glasscock expressed in a similar situation that "the use of trading price to determine fair value requires a number of assumptions that . . . are best made or rejected after being subject to a forensic and adversarial presentation by interested parties."[409]

As an example, even if one were to accept the legal theory that agency costs represent an element of value derived from the merger itself, little exists in the record to give the court any comfort about Solera's true unaffected market price. The $36.39 per share figure on which the Company relies represents the closing price on a *single* day, August 3, 2015.[410] Although the Company used that date in its proxy statement as the unaffected date for purposes of calculating a premium,[411] and I have referenced it in this opinion a number of times for context, the parties never litigated the issue of Solera's unaffected market price and the court is in no position based on the trial record to reliably make such a determination.

With respect to the merits of the theory that agency costs represent an element of value derived from the merger itself, the *Aruba* court explained that the "concept

---

[409] *AOL*, 2018 WL 1037450, at *10 n.118.

[410] PTO ¶ 79 & Ex. A.

[411] *Id.* ¶ 363.

of reduced agency costs is the flipside of the benefits of control," with the "key point" being that "control creates value distinct from synergy value."[412] This is because, as Professors Hamermesh and Wachter explain, "the aggregation of the shares is value-creating because a controller can then exercise the control rights involving directing the strategy and managing the firm."[413] They go on to argue that the "normative justification for awarding the value of control to the controller parallels the rationale for awarding the value of synergies to the bidder. Efficiency requires that those who create an efficient transaction—either through creating synergies or eliminating agency costs—should receive the value that they create."[414]

Significantly, however, a number of this court's appraisal decisions, one of which was affirmed in relevant part on appeal, suggest that the value of control is properly part of the going concern and not an element of value that must be excised under Section 262(h).[415] In *Le Beau v. M.G. Bancorporation., Inc.*, for example, respondent used a "capital market" approach that "involved deriving various pricing multiples from selected publicly-traded companies, and then applying those

---

[412] *Aruba*, 2018 WL 922139, at *3 n.17 (citations omitted).

[413] Lawrence A. Hamermesh & Michael L. Wachter, *Rationalizing Appraisal Standards in Compulsory Buyouts*, 50 B.C. L. REV. 1021, 1052 (2009).

[414] *Id*.

[415] *See id.* ("Finally, do minority shareholders receive the value of control that is created by the aggregation of the shares and the creation of a new controller? . . . Embracing the concept of an 'implicit minority discount,' the courts would award the dissenters [the value of control], on the theory that fair value should not be reduced for lack of control.").

multiples to MGB," the target corporation.[416]  Then-Vice Chancellor Jacobs rejected

the methodology because it "results in a minority valuation."[417]  The Supreme Court

affirmed this determination, explaining that the trial court's conclusion that the

"capital market approach contained an inherent minority discount that made its use

legally impermissible in a statutory appraisal proceeding [was] fully supported by

the record evidence that was before the Court of Chancery and the prior holdings of

this Court construing Section 262."[418]

Similarly, in *Borruso v. Communications Telesystems International*, Vice

Chancellor Lamb held that "a control premium should be added to adjust the market

value of the equity derived from the comparable company method."[419]   The court

explained it reasoning as follows:

> [T]he comparable company method of analysis produces an equity
> valuation that inherently reflects a minority discount, as the data used
> for purposes of comparison is all derived from minority trading values
> of the comparable companies.  Because that value is not fully reflective
> of the intrinsic worth of the corporation on a going concern basis, this
> court has applied an explicit control premium in calculating the fair
> value of the equity in an appraisal proceeding.[420]

---

[416] 1998 WL 44993, at *7 (Del. Ch. Jan. 29, 1998), *aff'd in part and remanded in part*, 737 A.2d 513.

[417] *Id.* at *8.

[418] *M.G. Bancorporation., Inc., v. Le Beau*, 737 A.2d at 523 (citation omitted).

[419] 753 A.2d 451, 452 (Del. Ch. 1999).

[420] *Id.* at 458.

More recently, then-Vice Chancellor Strine took the same approach in *Andaloro v. PFPC Worldwide, Inc.*[421] There, the court approved adjusting a comparable companies analysis by adding a control premium where "[w]hat is being corrected for is the difference between the trading price of a minority share and the trading price if all the shares were sold."[422]

Our Supreme Court held long ago that the going concern value of a company must be determined in an appraisal case "irrespective of the synergies involved in a merger."[423] *DFC* and *Dell* both make the same point.[424] Although *DFC* and *Dell* are transformative decisions in my view in their full-throated endorsement of applying market efficiency principles in appraisal actions,[425] I do not read those decisions—both of which unmistakably emphasize the probative value of deal price[426]—to suggest that agency costs represent an element of value attributable to a

---

[421] 2005 WL 2045640 (Del. Ch. Aug. 19, 2005).

[422] *Id.* at *18 (citing *Borruso*, 753 A.2d 451).

[423] *See Gilbert*, 731 A.2d at 797 ("[S]ection 262(h) requires that the Court of Chancery discern the going concern value of the company irrespective of the synergies involved in a merger.").

[424] *Dell*, 177 A.3d at 21; *DFC*, 172 A.3d at 371.

[425] *See Aruba.,* 2018 WL 2315943, at *8 & n.61 (reargument decision) (comparing *DFC* and *Dell* to how past "Supreme Court decisions had treated the unaffected trading price as a valuation indicator").

[426] *Dell*, 177 A.3d at 30 ("Overall, the weight of evidence shows that Dell's deal price has heavy, if not overriding, probative value."); *DFC*, 172 A.3d at 349 ("[E]conomic principles suggest that the best evidence of fair value was the deal price.").

merger separate from synergies that must be excluded under Section 262(h).  Had that been the Supreme Court's intention, I believe it would have said so explicitly.

Accordingly, I reject respondent's newly-minted argument that Solera's closing price on August 3, 2015 of $36.39 is the best evidence of Solera's fair value as of the date of the Merger.

## IV.    CONCLUSION

For the reasons explained above, petitioners are entitled to $53.95 per share as the fair value of their shares of Solera, plus interest accruing from the date the Merger closed, March 3, 2016, at the rate of 5% percent over the Federal Reserve discount rate from time to time, compounded quarterly.[427]

The parties should confer and submit a form of implementing order for the entry of final judgment consistent with this opinion within ten business days.  It is the court's intention to unseal the expert reports in this case in their entirety upon entry of a final judgment.  If, however, a party believes good cause exists to maintain any portion of any of the expert reports under seal, that party must file a motion within ten business days identifying the specific part that warrants further confidential treatment and explaining the basis for continuing such treatment.

**IT IS SO ORDERED.**

---

[427] 8 *Del. C.* § 262(h).